# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### THE COLUMBIA DIVISION
### AT COLUMBIA

RECEIVED
IN CLERK'S OFFICE
OCT 1 3 2015
U.S. DISTRICT COURT
MID. DIST. TENN.

| | |
|---|---|
| Austin Carter,<br>    Plaintiff, | )<br>) |
| vs. | )Case No. **1:15-cv-00090** |
| Corrections Corporation of America,<br>Damon Hininger, President of C.C.A.,<br>Tony Garfingle, Jason Medlin, Warden<br>Arvil "Butch" Chapman, Cheryl<br>Lindamood, Mark Hacker, Dan Deavers,<br>Katherine Buttram, Danial Dodd,<br>Christopher McClain, Derrick Schofield,<br>Tony Parker, Jason Woodall, Joel Foster,,<br>Bryant Williams, Bill Morgan, Dr. Robert<br>Cobble, Mrs. Rashti, John Doe Medical<br>Contractor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | )jury Demand |
|     Defendant(s). | ) |

## AMENDED COMPLAINT UNDER 42 U.S.C. § 1983
## FOR THE VIOLATION OF CIVIL RIGHTS

# Table of Contents

INTRODUCTION:.................................................................................................................1

TIMELINESS AND JURISDICTION:................................................................................2

PARTIES:.............................................................................................................................4

CORPORATE  LIABILITY OF THE AFORE MENTIONED DEFENDANTS:..........................7

EXHAUSTION OF ADMINISTRATIVE REMEDIES:.............................................................10

JURISDICTION AND AUTHORITY FOR STATE TORT CLAIMS:......................................11

STATEMENT OF CLAIMS:.............................................................................................12

CLAIMS (A) - (I)..............................................................................................................15

STATEMENT OF FACTS:................................................................................................15

CLAIMS (J) - (L)..............................................................................................................124

CLAIM (M).......................................................................................................................141

STATE TORT CLAIMS:...................................................................................................145

RELIEF REQUESTED:.....................................................................................................156

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### THE COLUMBIA DIVISION
### AT COLUMBIA

| | |
|---|---|
| Austin Carter, | ) |
|     Plaintiff, | ) |
| vs. | )Case No. **1:15-cv-00090** |
| Corrections Corporation of America, | ) |
| Damon Hininger, President of C.C.A., | ) |
| Tony Garfingle, Jason Medlin, Warden | ) |
| Arvil "Butch" Chapman, Cheryl | ) |
| Lindamood, Mark Hacker, Dan Deavers, | ) |
| Katherine Buttram, Danial Dodd, | ) |
| Christopher McClain, Derrick Schofield, | ) |
| Tony Parker, Jason Woodall, Joel Foster, | ) |
| Bryant Williams, Bill Morgan, Dr. Robert | |
| Cobble, Mrs. Rashti, John Doe Medical | |
| Contractor | |
| | )**JURY DEMAND** |
|     Defendant(s). | ) |

---

## AMENDED COMPLAINT UNDER 42 U.S.C. § 1983
## FOR THE VIOLATION OF CIVIL RIGHTS

---

### INTRODUCTION:

(1)    COMES NOW, the Plaintiff Austin Carter # 400700, *pro se*, pursuant to **42**

      **U.S.C. § 1983**, and **T.C.A. § 28-3-104**, *Personal Tort Actions* for various

1

civil rights violations as well as various state tort claims of Official

oppression, negligence, intentional infliction of emotional distress,

Intentional infliction of pain and suffering, assault and battery,

## **TIMELINESS AND JURISDICTION:**

(2)    The Court has jurisdiction over the Plaintiff's claims of violation of federal

constitutional rights under **28 U.S.C. § 1331** and **28 U.S.C. § 1343**.

(3)    Plaintiff avers that from the face of the instant compliant he's clearly

identified the *relevant time line* for the events in question which form the

factual basis of his claims.

(4)    This relevant time line, consists of a period of time spanning, not just his

serious and grave injury which occurred on September 30th, 2014, but also

the two whole years of his arrival at South Central Correctional Complex on

February 2014 until the present September 25th, 2015.

(5)    Plaintiff avers that under either the one year Statute of limitations or the

***continuing wrong doctrine***, his claims would be both timely and colorable.

("Claims in Tennessee are subject to a one-year statute of limitations.."

Berndt v. Tennessee, 796 F. 2d 879, 883 (6th Cir. 1986) ("..whether bringing

class as one for simple negligence under state law or as a civil rights cliams

2

pursuant to 42 U.S.C. § 1983 for the purposes of the statute of limitations, however there is no distinction. The personal injury one-year statue of limitation's applied to 'civil actions for compensatory or punitive damages, or both, brought under the federal civil rights statues. Tenn.Corr.Am. 28-3-104(a)(3)...") Johnson v. Corr. Corp. of America, 2006 Tenn.App. Lexis 70, (Dec. 19[th], 2005).

(6)   Plaintiff avers that his allegations concerning the continuing violations of his rights by the defendants, makes the ***continuing wrong rule*** applicable in his case, exclusively because of ***the continuing actions of the Defendants***, Correction's Corporation of America, et al., not the accrual of his injuries and harm. See **Delaware State College v. ricks, 449 U.S. 250, 258 (1980).** ("..However, the basis of the complaint is to treat an ongoing harm, the continuing wrong rule is automatically applicable..")

(7)   Indeed Plaintiff avers that all of the Defendants who were involved with him in the earlier part of February 2014 are, still here at South Central Corrections, committing acts which violate Plaintiffs civil rights, as of October 2015. See **Shell. v. Brzeznial, 365 F.Supp. 2.d. 362, 368 (W.D. N.Y 2005)** ("...Continuing wrong rule applies, .....where the defendants

3

involved *in the older parts of the claim* were involved in **actions within the limitations period.....**")

## **PARTIES:**

(8)   The Plaintiff, Austin Carter # 400700, is and has been incarcerated at the South Central Correctional Facility (herein "SCCF") during the events described in this complaint.

(9)   Corrections Corporation of America, is a corporation based in 10 BurtonHill Blvd., Nashville, Tennessee 37215, and is being sued in it's official and individual capacity.

(10)  Damon Hininger, is the President and C.E.O of Corrections Corporation of America, based in Nashville Tennessee, and he is being sued in his official and individual capacity.

(11)  Tony Garfingle, is the Exec. Vice President and Chief Development Person of Corrections Corporation of America, based in Nashville Tennessee, and he is being sued in his official and individual capacity.

(12)  Jason Medlin, is the Regional Director of Corrections Corporation of America, for Middle Tennessee, and and he is being sued in his official and individual capacity.

4

(13)  Warden Arvil Butch Chapman, was the warden at South Central Corrections Facility, (hereinafter referred to as S.C.C.F.,) located at 555 Forest Ave., P.O.Box., 279, Clifton Tennessee, 38425, and is being sued in his official and individual capacity.

(14)  Warden Cheryl Lindamood is the current Warden of S.C.C.F. and is being sued in her official and individual capacity.

(15)  Katherine Buttram, is the current Unit Manager for Zone 2 at S.C.C.F. and is being sued in her official and individual capacity.

(16)  Danial Dodd, is the Associate Warden, Warden of S.C.C.F. and is being sued in his official and individual capacity.

(17)  Dan Deavers, was the Deputy Warden, Warden of S.C.C.F. and his estate is being sued in his official and individual capacity.

(18)  Christopher McClain, is the Chief of Security at S.C.C.F. and he is is being sued in his official and individual capacity.

(19)  Mark Hacker, is the Assistant Chief of Security at S.C.C.F. and he is being sued in his official and individual capacity.

(20)  Derrick Schofield, is the Commissioner of the Tennessee Department of Correction, and he is being sued in his official and individual capacity.

5

(21) Jason Woodal, is the Deputy Commissioner of the Tennessee Department of Correction, and he is being sued in his official and individual capacity.

(22) Tony Parker, is the Assistant Commissioner of the Tennessee Department of Correction, and he is being sued in his official and individual capacity.

(23) Joel Foster, is the liaison for the Tennessee Department of Correction, and he is being sued in his official and individual capacity.

(24) Bryant Williams, was the contract monitor for the Tennessee Department of Correction, and he is being sued in his official and individual capacity.

(25) Defendant Bill Morgan is a maintenance employee for the SCCF and is responsible for responding to and correcting any and all maintenance concerns assigned to him for that facility, and he is being sued in his official and individual capacity.

(26) Defendant Mrs. Rashti, (FNU) is the head nurse for the SCCF and is responsible for screening and treating the medical concerns of all inmates housed at that facility pursuant to the instructions of Defendant Dr. Robert Cobble, and she is being sued in her official and individual capacity.

(27) Dr. Robert Cobble is the Doctor and acting health administrator, for the SCCF and is responsible for overseeing the medical treatment of all inmates

6

housed at that facility. He is being sued in his official and individual capacity.

(28) John Doe Medical Health Services,(real name unknown at current time) is the contractual health care provider and employer of Dr. Robert Cobble, and it is being sued both in it's individual and official.

## CORPORATE LIABILITY OF THE AFORE MENTIONED DEFENDANTS:

(29) A private corporation that performs the traditional state function of operating a prison acts under the color of state law..." Thomas v Coble, 55 F. App'x 748, 748 (6th Cir 2003)

(30) Plaintiff avers that Corrections Corporation of America and it's employees are properly named defendants in the instant suit because although, technically they are private entities, they pass the public function test and act under the color of state law.

(31) Our Courts have routinely recognized the "public function test" "for determining whether private conduct is fairly attributable to the state." Ellison v. Garbarino, 48 F.3d 192, 195 (6th Cir. 1995). "The public function test 'requires that the private entity exercise powers which are traditionally exclusively reserved to the state.'" Id. (quoting Wolotsky v. Huhn, 960 F.2d

7

1331, 1335 (6th Cir. 1992)). The defendants were "acting under color of state law" in that they were performing the "traditional state function" of operating a prison. See Hicks v. Frey, 992 F.2d 1450, 1458 (6th Cir. 1993) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under 1983 as one acting 'under color of state law.'"

(32) The Sixth Circuit has applied the standards for assessing municipal liability *to claims against private corporations that operate prisons*. (id., 748). **Johnson v Corr. Corporation. Of Am. 26 F App'x 386, 388 (6th cir 2001).**

(33) Thus, to prevail on a 1983 claim against Correction Corporation of America, (hereinafter C.C.A.) Plaintiff 'must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation' of his right." (id)

(34) Claims specifically against C.C.A. are appropriate because this sole corporation is responsible for the customs, policies and regulations that govern the operation of South Central Correctional Complex, under the auspices of a privately run company.

(35) Under **42 U.S.C. § 1983,** much like municipalities, private corporations

8

like C.C.A. are considered "persons" and therefor may be liable for causing a constitutional deprivation. **Monell. v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978),**

(36) For the purposes of **42 U.S.C. § 1983,** Plaintiff must, can and will demonstrate that "through its deliberate conduct, the corporation, just like a municipality was the 'moving force' behind the injury alleged." Bd. Of Cnty. Comm'rs v. Brown, 520 U.S. At 404

(37) Indeed C.C.A., is liable based on the fact of: (1) their conduct pursuant to an expressly adopted official policy; (2) a long standing practice or custom which constituted a standard operating procedure of S.C.C.F prison; (3) a decision of a decision making official who was, as a matter of state law, a final policy making authority whose edicts or acts may fairly be said to represent official policy in the area of decision; (4) an official with final policy making authority either delegating that authority to , or ratifying the decision of a subordinate.

(38) Plaintiff avers that he will be able to show through credible evidence and factual pleadings that C.C.A was the moving force behind official policies that resulted in his constitutional rights being violated

9

(39) All Defendant(s) have acted, and continue to act, under color of State law at all times relevant to this complaint.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES:

(40) Plaintiff avers that he has attempted to exhaust his administrative remedies for each and every claim he is presenting in the instant suit, by filing a grievance pursuant to T.D.O.C. 501.02 and **42 U.S.C. § 1997(e)** and **T.C.A. § 41-21-806**, *Claims subject to review*

(41) Plaintiff avers that he has, exhausted his administrative remedies offered here at S.C.C.F.

(42) Plaintiff avers that there have been numerous instances wherein he has filed a grievance only to have the said grievances, ignored or thrown away and simply unprocessed. See **Baylis v Taylor 475 F. Supp. 2d. 484,** ("....Where grievances were returned unresolved, inmates administrative remedies were presumed exhausted for purposes of 42 U.S.S. 1997(e)..") See also **Turner v Burnside, 541 F.3d 1077, 1082 (2008)** ("..where warden tore up prisoner's grievance, he was not required to re-file his grievance or grieve warden's action, neither of which were prescribed by policy..");  see also **Miller v. Berkebile, 2008 WL 635552, \*7-9 (2008)** ("...where official refused to

10

process grievance contrary to policy, prisoner's were not required to take steps not prescribed in the policy to get around him.."); see also **Dole v Chandler, 438 F. 3d. 804, 809 (2006)**("..Prison officials may not take unfair advantage of the exhaustion requirement.....and a remedy becomes unavailable if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting...".)

(43)  Therefore, every issue that he is presenting to this honorable Court that was subject to review of an administrative proceedings, pursuant to **42 U.S.C. § 1997(e)** and **T.C.A. § 41-21-806**, *Claims subject to review*, has been properly, lawfully and clearly presented to S.C.C.F. And the Tennessee Department of Corrections, via their liaison and grievance procedure.

## JURISDICTION AND AUTHORITY FOR STATE TORT CLAIMS:

(44)  Plaintiff avers that he is bringing a hybrid array of civil claims, pursuant to both Federal law **42 U.S.C. § 1983.** and state law, **T.C.A. § 28-3-104,** *Personal Tort Actions:* et seq.,

(45)  This Honorable Court has the authority to entertain suits brought before it,

11

though governed specifically by state tort law. See **28 U.S.C. § 1367.**

**Pendent Supplemental Jurisdiction of Federal courts;** see also Hagans v

Lavine, 415 U.S. 528, 545 (1974)

(46) The exercise of federal supplemental jurisdiction is required when ever

"....the values of judicial economy , convenience, fairness and comity"

require such. Carnegie-Mellon Univ. Cohill, 484 U.S. 343, 350, (1988);

Landefeld v. Marion Fen. Hosp. Inc., 994 F.2d 1178, 1182 (6th Cir. 1993) .

(47) Therefore, this Honorable U.S. District Court should exercise it's

supplemental jurisdiction over Plaintiff's state tort claims in the case sub

judicie, because ".the values of judicial economy , convenience, fairness and

comity" require such. (id.)

## STATEMENT OF CLAIMS:

(48) A reasonable aggregation and representation of these claims, based on the

factual allegations contained in the instant complaint can be expressed as

follows:

a.) Due to the dangerous and uncontrolled conditions of
confinement Defendants allowed Plaintiff to be continually
subject to physical assaults and abuse from other inmates in
overcrowded housing units, in direct violation of his 8th Amend
U.S.Const. Rights against cruel and Unusual punishment.

12

b.) Due to the dangerous and uncontrolled conditions, Defendants allowed violent gangs and Security threat group organizations to control whole units and tiers in the housing units, which resulted in Plaintiff being violently assaulted and seriously injured, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

c.) Due to the willful and intentional acts of Defendants to save money, stream line operations, and achieve political ends of appearing tough on crime-the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was subjected to a-substantial and ever present-pervasive risk of serious harm in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

d.) Due to the willful and intentional acts of Defendants to save money, stream line operations, and achieve political ends of appearing tough on crime-the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was violently assaulted and seriously injured, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.

e.) Due to an inherent failure to properly train staff, the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was subjected to a-substantial and ever present-pervasive risk of serious harm, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

f.) Due to an inherent failure to properly train staff, the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was violently assaulted and seriously injured, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.

g.) Defendant's denied Plaintiff adequate medical treatment of a serious medical condition; to wit: a acute repository distress, and associated symptoms caused by the lack of sanitary conditions and black Mold in the cells wherein he was confined-in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

13

h.) Due to the dangerous and unsanitary conditions of confinement Plaintiff suffered from sever medical problems, that to this day have never been properly treated, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

i.) Due to the dangerous and unsanitary conditions of confinement Plaintiff contracted and suffers from, a series of debilitating and painful skin rashes that to this day have never been properly treated and left his skin pot marked and disfigured, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

j.) Due to the dangerous and unsanitary conditions of confinement Plaintiff suffered a debilitating injury, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

k.) Due to the inadequate medical treatment Plaintiff received, his sever back and neck injury was never properly treated, nor was Plaintiff ever given any adequate pain medication to help him deal with the terrible and excruciating pain he was suffering from, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

l.) Due to the willful and intentional acts of the Defendants to save money and stream line operations the Defendant's willfully and intentionally denied Plaintiff necessary treatment for his chronic injuries and serious medical condition, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.

m.) Due to the malicious and harmful intent of Defendants to make Plaintiff suffer the wanton and gratuitous infliction of pain and suffering, _plaintiff was forced to walk with hands behind his back, up and down wet flights of stairs, which resulted in serious and grave injuries,_ in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

14

**Claims (a) - (i)**

## STATEMENT OF FACTS:

(49) Plaintiff avers that for all relevant times and events in the case at bar, he is and has been an inmate detained at South Central Correctional complex, located at 555 Forrest Ave., P.O.Box 279, Clifton Tennessee 38425. (hereinafter referred to as S.C.C.F.)

(50) Plaintiff arrived at S.C.C.F. during the month of February 2014 and was assigned to Colombia B-Cell 213 Housing unit, Zone 2

(51) Plaintiff was held in this unit for approximately 50 days. (i.e;. from mid February to April 15th, 2014)

(52) Plaintiff, who is a 51 year old African American male, with already deteriorating health, was placed into a unit with a gang affiliation rate of well in excess of 80%. (i.e. Out of the 128 [one hundred and twenty eight inmates, over 104 of them were confirmed and or suspected members of inmate Security threat groups].

(53) These security threat groups come in various names, affiliations and stripes (i.e. were referred to as Crips, Bloods, Gangsta Disciples, Vice Lords, Aryan Brotherhood, Aryan Nation, White Aryan Resistance, etc.)

15

(54) Plaintiff avers that regardless of the name or individual affiliation of the organizations, they all shared several common factors and behavioral tendencies, that resulted in plaintiff Carter being terrorized and violently assaulted, as well as extorted.

(55) Plaintiff avers that for the several weeks he was assigned to Columbia, he was terrorized and violently assaulted, as well as extorted by various violent inmates who belonged to criminal Gang organizations, referred to officially as STG (security threat group).

(56) Pursuant to *SECURITY THREAT GROUP PROGRAM IDENTIFICATION, PLACEMENT, AND OPERATION,* TDOC Policy 506.26 (IV)(D) "Security Threat Group (STG),is:

> Any formal or informal group, organization, or association of individuals who possess common characteristics which serve to distinguish them from other groups or individuals and who have been determined to be acting in concert so as to pose a threat or potential threat to staff, other inmates, the institution, or the community."

(57) The Defendant CCA has it's own policy No. 17-101A.3(A) which defines *SECURITY THREAT GROUP* as:

> "...group of individuals possessing common characteristics which serve to distinguish them from other individuals or groups and have been determined to be acting in concert so as to pose a threat or potential threat to staff, other inmates, the institution, or the community."

(58) Therefore, both the TDOC and C.C.A. were aware of and had active

16

conscious knowledge that STG's were not only a real and present danger, but that they had to be addressed properly, in order to ensure the safety of Plaintiff and other inmates.

### *SHOWER ESCORTS AND BREAKING SECURITY:*

(59) The procedure for the showers, is quite simple, and uniform throughout the gang infested prisons in the State of Tennessee

(60) Inmates, of lets say the Bloods, will holler out something like "showers" or "Blood Game", and at which time up to 12 to 15 inmates will strategically post them selves on the tiers/cat walk, so as to provide a cordon of security for an inmate going to the showers.

(61) During this time, only inmates who belong to that particular S.T.G organization (ie in this case the Bloods) are allowed to in any way approach, intercept or come close to this particular inmate going to the showers.

(62) If at any time Plaintiff or any other non-blood affiliated inmate approaches either the inmate going to the showers or his path to the showers, this is considered to be "breaking security" (i.e. breaching the security protocols that the gang members have established her at S.C.C.F as well as throughout the State of Tennessee. )

17

(63) This in effect means that STG affiliated inmates have the unencumbered right to literally take over substantial portions of the housing unit, (i.e whole tiers and staircases; and the shower units, ice machine, and exit and entrance to the very housing unit itself, as well as to the individuals cells/cell doors to enter the cells,) and forcing Plaintiff Carter to have to be subject to the control and dominion of other inmates.

(64) Such blatant conduct violates several TDOC polices, which the defendants knew about and refused to enforce, for instance TDOC policy **505.07(VI) (E)(1)**, states that: "... No program assignment shall result in an inmate being obligated to obey or be supervised by another inmate in any manner..." yet this is just what defendants' CCA and S.C.C.F staff allow through their blatant willful refusal to protect Plaintiff Carter, and stop the wholesale participation of STG activity.

(65) Therefore, Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram failed to act reasonably by ensuring that STG inmates, who were easily confirmed and verifiable pursuant to **506.26(VI)(B)(4)(c)(d)(e)(f)(i)**,, were prevented from openly, blatantly and wantonly engaging in STG activities such as escorting to the showers, and taking over substantial

portions of the housing unit, (i.e. whole tiers and staircases. ) and forcing

Plaintiff Carter to have to be subject to the control of dominion of other

inmates,

(66) Plaintiff avers that such blatant conduct, like *Escorting*, violates several

TDOC polices, which the defendants knew about and refused to enforce, for

instance TDOC policy **505.02(VI)(A)(1)**, defines the following offenses,

that are violated every day by STG affiliated inmates, that assaulted,

extorted a,d terrorized Plaintiff:

[47.] Participation in Security Threat Group Activities (PGA) (Class A): To organize, promote, encourage, or directly participate in a security threat group or security threat group activity.

[68] Strong-armed Activity (SAA) (Class B): Intimidation or coercion of unwilling inmates to participate in any act.

[69] Strong-armed Robbery (SAR) (Class A or B): The forcible taking of money or goods of any value from another person.

[70] Tampering with Security Device or Equipment (TSD) (A or B): Tampering with locking or other security devices or equipment causing that device to malfunction or become inoperable.

[72. Threatening Offender (TOF) (Class C): A threat to an inmate, whether verbal or physical, explicit or implied.

[75] Violation of TDOC/Institutional Policies (VPR) (Class B or C): Failure to comply with written rules governing inmate behavior. The incident report shall cite the TDOC policy or institutional policy violated, including policy section and subsection numbers.

[76] Violation of State Law (VSL) (Class A or B): Any violation of T.C.A. Not specifically addressed in this policy. The incident report shall cite the state law and TCA Code.

(67) Therefore, Defendant's Chapman, Killingsworth, Dodd, McClain, and

Buttram failed to act reasonably by ensuring that the above disciplinary

19

measures and State laws were enforced, so as to prevent literally hundreds of inmates in Plaintiff's hosing unit from openly, blatantly and wantonly engaging in STG activities such as escorting to the showers, and forcing Plaintiff Carter to have to be subject to the control of dominion of other inmates which resulted in him being assaulted, extorted and terrorized.

***Defendant's Chapman, Killingsworth, Dodd, McClain, Hacker, and Buttram failed to act reasonably in light of the known pervasive risk of serious bodily and injury and assault***

(68) Defendants had active, direct, timely and irrefutably detailed knowledge of the facts of pervasive gang activity, violence, threats and extortion; coupled with their flagrant and blatant disregard of the grave risk of injury to plaintiff while being held in this unit for approximately 50 days. (i.e. from February to sometime in March 2014)

(69) Indeed here at South Central then Unit Manager Killingsworth, Warden Arvil Butch Chapman, Then Counsel-now Unit Manager Buttram, Associate Warden Dodd, all knew of and allowed this blatant escapade of perpetual STG activity to not only go on, but to flourish, until the point that it had become a de facto policy, enforced by staff members them selves.

(70) Indeed the Defendant's Chapman, Killingsworth, Buttram, Dodd, blatantly

20

allowed inmates to escort one another to the showers and have gang meetings in their cells, and _basically take over portions of the housing unit for their own gang security reasons_.

### _Initial series of Assaults_

(71)  Plaintiff had the misfortune of breaking security, shortly after his arrival at S.C.C.F. during his assignment at to Columbia (i.e. during February 2014) and was assaulted by unknown assailants from, who he was led to believe were either of the black Crips and/or bloods gangs.

(72)  Apparently, unbeknownst the Plaintiff he had crossed into the security of the bloods and in attempting to extricate himself from their security, breached the security of yet another STG, the Crips.

(73)  This resulted in a joint alliance violation, whereby not only was plaintiff violently assaulted by perhaps one or both gangs, but was extorted to the tune of $500 (five hundred dollar's)

(74)  During this assault Plaintiff suffered a busted lip, contusions to his head and face, injuries to his ribs, neck and lower back.

(75)  To this day he continues to suffer sever pain from this debilitating attack

(76)  The inmates who assaulted Plaintiff came into the pod through the front door

2¡                                    21

of the housing unit, which was never secured as it was supposed to be.

(77) They were able to come into the pod mix with their other brothers and be given the assignment of assaulting plaintiff, despite the fact that the assailants did not live in the Columbia B.

(78) This freedom of movement, was a de facto polcy that C.C.A staff members, seniors and administration officials had allowed freely and with no restriction.

(79) Furthermore, in a fit of desperation Plaintiff attempted a resolution of sorts with his assailants by trying to reason with them.

(80) Plaintiff told one of his assailants, that if he assaulted plaintiff and Plaintiff was forced to go to the clinic, Plaintiffs family would find out and Plaintiff wouldn't be able to control the events that would play out after ward.

(81) Plaintiff stated: "Man my family will call the governor and commissioner, and ya'll might get discovered by an investigation, that I ain't have nothing to do with."

(82) To which one of the young assailants replied, "bitch I'm fresh off max, and don't give a fuck. Cause I ain't going back because they closed the max units beds down."

22

(83) In other words, these young gang members who had just recently arrived at the institution (ie with in the last 12 months) were directly released off of maximum security, had no fear of any consequences for their violent STG activity, because even in the face of explicit threats of being punished by placement in Maximum security, they knew that based on Defendant Schofiled's actions they would not be placed on max or segregated or punished.

(84) Thus, even if Plaintiff Carter's family were to call and report on these inmates directly, to the administration of C.C.A. and the TDOC, they the assailants wouldn't be punished nor, locked down and put on maximum security status, nor even taken off of the compound's general population with plaintiff.

(85) Not only was this the actual believe of Plaintiff's assailants, but this was the reality .

(86) Plaintiff avers that these young gang members who had just recently arrived at the institution (ie with in the last 12 months) were directly released off of maximum security, as a direct result of TDOC commissioner Schoflield, Jason Woodall, and Tony Parker's decision to reduce the majority of inmates

23

on maximum security to medium and minimum security levels, so that they wound up being housed with lower level security inmates in the general Population like Plaintiff Carter.

(87) Therefore, these young gang members who had just recently arrived at the institution (ie with in the last 12 months) were directly released off of maximum security, had no fear of any consequences for their violent STG activity, even in the face of explicit threats of being punished by placement in Maximum security, because of the direct results of the decisions and actions of TDOC Commissioner Schofield, Jason Woodall, and Tony Parker who insisted on: (i) not reporting assaults as assaults, so as to hide the true level of violence in the TDOC; and (ii) reducing the level of dangerous violent STG members on maximum security in order to save money and reduce budget costs; and: (iii) creating a militaristic environment wherein Plaintiff , along with other TDOC inmates, were made to suffer and feel anguish and misery. (see Claim; Statement of Facts. TDOC Defendants)

(88) Thus, Plaintiff Carter can show and has shown, not only an actual assault that occurred and a resulting degree of serious physical injury.

(89) However, even in the absence of such, Plaintiff could still show a

24

"..sufficient inferential connection between the [actions of Defendants TDOC and CCA in: (i) allowing unfetter STG activity; (ii) a senseless classification system; and (iii) a ill conceived plan to randomly reduce the amount of violent STG inmates assigned to maximum security status, in order to save money] and inmate violence to justify a reasonable fear for personal safety.." Thompson v Cty of Median, at 243

(90) Plaintiff's reported these injuries and events to both Killingsworth and Buttram, but was told only "welcome to S.C.C.F " and that "I could thank [TDOC Commissioner] Schofield. And C.C.A.." because they were "responsible for this mess".

(91) Plaintiff was specifically told that he could not go to protective custody either because "he didn't have any snitching to do about owning any drug money or cell phone debts.."

(92) Therefore, the only way Plaintiff would have been eligible for Protective custody would have been if he had engaged in criminal conduct punishable by more time in prison. (see **T.C.A. § 39-16-201** *Introduction of Contraband into a penal facility.*)

(93) Plaintiff was further denied medical treatment for his wounds from the

assault because when he attempted to go to the clinic they would not see him, and told him he had to sign up on sick-call.

(94) Plaintiff then within days of the assault told then Warden Chapman and Dodd, and McClain who were walking together on the compound, that he had been assaulted, and immediately wanted to be transferred to the Annex, to get away from this uncontrolled violent environment.

(95) At which time they all laughed and Defendant Chapman said "..they to would like to get away from 'South central'.."

(96) Plaintiff specifically told Defendant Chapman, in the presence of Defendant's Dodd, McClain, then that it wasn't safe in the housing unit and that the "gangs run everything" and that he needed to be moved immediately.

(97) However, he was told by Defendant Chapman, "these are the breaks my friend," and that" you might want to be more careful in the future..".

(98) Despite Plaintiff's disbelief of these egregious and outrageous responses, Defendant Chapman, in accordance and agreement with Defendant Dodd and McClain, told Plaintiff that "he better get used to paying attention" and that "gangs are the new reality" and that "Central office knows all about this

shit.....but it's out of our control.. so deal with it.."

(99) Arvil stated specifically also that any and all problems that I was having with security, would be handled by "these gentlemen" right here indicating both Defendant's Dodd and McClain.

(100) At which time Plaintiff told them that there was definitely a problem and that this "shit is ridiculous" and that "I shouldn't' have to live like this."

(101) This brought more laughter, and retorts of "well welcome to South Central", and you can waste a "stamp and write central office" and "your [TDOC Commissioner Derrick] Schofield and his boss the Governor [Bill Haslam]..." and while your at it "tell him thanks for the shit we all have to deal with..."

(102) However, they did offer Plaintiff the option of going to "the butt naked tank for "..a little vacation..",

(103) Therefore, Petitioner was given[1] the choice of having to sit naked in a feces smeared freezing cell or go back to an environment wherein sheer violence and gang brutality reigned supreme.

---

1     The butt naked tank refers to suicide watch cell, wherein an inmate is stripped naked and given protective one piece smock in order to prevent the inmate from harming himself, during periods of suicidal tendencies. And in these cells the inmates usually smear feces on the walls and the smocks are never washed.

(104) Plaintiff must reiterate that this rampant STG activity, also consisted of:

a) fellow gang members rigging their doors (i.e. tampering with the locking mechanism of the cell door so that they could enter and exit the cells at any time they so desired:

b)    coming to an inmates cell and tell them *to get out so that their "brother" can get the cell.*

c)    escorting to and from the showers and taking over whole portions of the housing unit's while doing so.

d)    All of this was done, and *is still done* on camera every day, and plain view of Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram. Who had access to and the ability to check the cameras.

e)    Furthermore, Unit team/staff, seniors, and CO's not only fail to in any way stop it, but they actively promote it by getting out of the way themselves. (ie when inmates pass them escorting their fellow gang members while screaming "shower" the pod offices, seniors and the Defendants, Buttram, et al., on both first and second shift, not only refuse to in any way stop this blatant violation of STG policy, **but they literally move out of the way themselves**.)

(105) To add insult to injury, these STG affiliated inmates will then attempt to charge unaffiliated inmates like Plaintiff $500(five hundred) dollars, if we "break their security" (ie commit the offense of getting in front of an STG member while he is being escorted to the showers).

23

(106) And if an inmate like Plaintiff at first refuses or is unable to pay, they will be physically assaulted by being jumped, just like they did to Plaintiff Carter (i.e. Several of them attacking you at one time.)

(107) Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram do not in any way help the situation because they will not make any moves for inmates like Plaintiff out of the units that are gang infested, and into units at places with lower level security like the Wayne County Annex, Deberry Special Needs Facility, or to the over 50 /Veterans pod, where the STG policies are strictly enforced.

(108) Once again Plaintiff Carter must reiterate that in housing Units Discovery A and B, ***the STG policies are strictly enforced,*** because if an inmate is caught or even observed participating in any manner of STG activity, he is immediately removed and subject to disciplinary proceedings; in addition to this extra special attention is paid to the inmates who are assigned to or classified for participation in these programs.

(109) However, because these pod are connected to Federal Government funded programming, there is a purposeful and willful intent on the part of the Defendants to ensure that the rules are scrupulously applied in these housing

29

units, whereas in Columbia, Apollo and Gemini they are not.

(110) Plaintiff wishes to stress and emphasize that the decision of Defendant's Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram to knowingly allow and actively permit rampant uncontrolled STG activity in housing units Apollo, Gemini, and Columbia is willful, intentional, and done with absolute forethought, premeditation, knowledge and complete awareness.

(111) Indeed, due to Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram expressed instructions to their subordinates (i.e. the actual pod officers and seniors running the units) not to interfere with or in any way interdict STG activity regarding shower escorts, and the other ancillary actions of the STG members (i.e forcing inmates out of the cell while their brothers come in or out for showers), Petitioner was not only subjected to a violent debilitating attack, but he also suffered from the very real fear of serious injury and continued attacks.

(112) Indeed, on September 2013 in Gemini A pod, in Zone 1, at S.C.C.F an inmate named Gerald Ewing was brutally murdered and tortured due to gang affiliation based riot.

30

(113) In March 29th, 2014 in Columbia B Pod, in the very same Zone where Petitioner was housed, a Caucasian inmate named Jeffery Sills was violently murdered by his *gang affiliated cell mate*, despite repeated attempts by the victim to change his cell and get moved to another cell, and get out of the gang infested unit, as required by Policy # 506.14(VI)(A)(3)(a). And all of the seniors who were working that night, are still working at South Central Correctional facility, til this day. (see **Attached Exhibit #4** **Site's Violence Add to problem**, *Tennessean.*, August 3rd, 2015; Tom Wilemon)

(114) Then to add insult to injury, these younger gang members that the Defendants allowed *carte Blanche* to, will stand in the pod and expose their genitals to female staff members in plain cite of other inmates, with out giving a thought as to how disgusting and disrespectful their conduct is, and in plain site of the cameras.

(115) The Defendants, then not only fail to lock these sex offending inmates up in segregation or put them on close, but S.C.C.F. Staff (i.e the Defendant's Chapman et al, ) doesn't even require that their subordinates write them up for these offenses a lot of times)

(116) Therefore, this new generation young STG members have zero ability to

31

understand the concept of respecting other men, or acting in humane and civilized manners.

(117) The defendants thought nothing of placing plaintiff in a cell and housing unit, with an affiliated gang member who blatantly engaged in STG activity. (ie, (i) he flashes the females guards, or (ii) has his brothers come to my cell and tells me to get out so that he can get the cell, or (iii) want's to hold multiple knives for his brothers, or (iv) he wants to have his brothers come and sit in the cell with him and have gang meetings, etc; and (v) escort each other to and from the showers.

(118) Plaintiff has genuinely feared these inmates, and the environment of out of control violence that has been created by lawlessness and *carte Blanch*e and impunity of these inmates to engage in organized STG activities.

(119) The Defendant's, by placing Plaintiff in the same cell/housing units with a multitude of affiliated gang member who blatantly engages in STG activity- caused plaintiff to not only be violently assaulted, extorted, and terrorized, but live in genuine **fear that** *either he would be killed.*

(120) Plaintiff Carter avers that, pursuant to 506.26(VI)(B)(4),

All recommendations for placement in the STG phase program shall be based more of the following criteria, one of which must be (6)(a).
a. The inmate's status as a confirmed, active STG member

32

b. The inmate has demonstrated propensity for violence
c. The inmate's STG or drug-related disciplinary history
d. Documentation indicating that the inmate's actions may pose a
threat to secure, and orderly operation of the institution
e. Information from a confidential source indicating STG activity
f. Investigative reports/records
g. Staff information
h. Verified news media accounts
i. Intelligence sharing

(121) Therefore, at all times, in order to invoke the authority of STG unit and

program placement of all STG inmates who engage in STG activity, the only

thing that defendant's Chapman, Killingsworth, Dodd, McClain, and

Buttram had to do, was simply look *at the video footage* **which is recorded**

**daily and stored for 30 days, or simply ask a pod officer at anytime,**

**which inmates were escorting to the showers,**

(122) Indeed pursuant to 506.26(VI)(B)(4), two of the five criteria for STG

identification and placement would have been automatically met, under

either **506.26(VI)(B)(4)(c)(d)(e)(f)(i)**

(123) Therefore, the choice of these defendant's Chapman, Killingsworth, Dodd,

McClain, and Buttram not to implement, or force the implantation and

proper enforcement of **506.26(VI)(B)(4)(c)(d)(e)(f)(i)** ensured that Plaintiff

would be assaulted, extorted and terrorized.

(124) All Defendant(s) have acted, and continue to act, under color of State law at

33

all times relevant to this complaint and that these defendant's were not only willful and malicious in their flagrant disregard of Plaintiff Carter's safety, but that they were objectively aware of the grave risk of serious bodily injury that Plaintiff suffered, and that they willfully and intentionally failed to act reasonably by ensuring that Plaintiff was compatible with the violent and prevalent STG inmates to whom he was forced to share a housing unit with.

### *MORE ASSAULTS IN 2015:*

(125) Plaintiff avers that during the Months of March 2014 to March 2015, plaintiff was assigned to RDAP program located in Discovery A, in Zone 2, wherein Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram also ensured that the STG policies *were vigorously enforced*, so as to ensure that this Federally funded program was not in any way jeopardized with bad publicity.

(126) Indeed during the entire year he was in the program not a single inmate was allowed to escort another inmate, engage in any type of STG activity or extort and terrorize Plaintiff Carter.

(127) Therefore, this shows that Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram knowingly allowed the pervasive gang activity that

34

permeated Columbia A and B., while Plaintiff was there prior to his assignment to the RDAP program.

(128) After Graduating the RDAP program, plaintiff was kept in the programs housing unit (DA) for two extra months, because of an institutional lock down.

(129) Afterward he was moved back to Columbia B and then to Apollo B 231, and he was then moved to the annex, until around August 7th, 2015.

(130) He then moved to back to Columbia A 202, or or about August 8th, 2015.

(131) Plaintiff once again, while not breaking security in the traditional sense, was never nevertheless accused of doing so when he got into the "wrong shower". (i.e. he used a shower that an organization said was theirs, and therefore this in and of itself, was a "breaking security" violation. )

(132) Of course, Plaintiff was assaulted again, and this time, despite fighting back, suffered from a swollen lip, blacked eye, knots on his head, contusions and various bruises on his body.

(133) This time, Defendant Lindamood, who is the current Warden, was just as hapless and feckless in her responses to this crisis of STG activity, for she has failed to reassign inmate to another annex or stop the prevalent and

35

rampant STG activity, prior to this second series of violent assaults.

(134) Despite being specifically told by Plaintiff Carter, prior to his assaults, that this STG activity was out of control and constituted a grave threat personally to plaintiff, she to simply retorted, "...there's nothing I can do about it.." and the "Commissioner..and central office are to blame....".

(135) Dan Deavers, who was the assistant warden who was a replacement that came with Cheryl Lindamood, flat out told Plaintiff, during a surprisingly candid conversation in front of the unit, that not only was the "TDOC fucked up but that CCA was really in the crapper."

(136) Defendant Dan Deavers, acknowledge that just about every thing that could go wrong with a prison or be "bat shit crazy" was the reality at S.C.C.F.

(137) Dan Deavers, flat out said that "our staff is fucked up" and "unprofessional" "needed proper training" and had a gang problem that was absolutely "out of control".

(138) And on top of all of this had "management in Nashville that didn't give a shit about the inmates or the workers, and just wanted to make Nashville happy, by covering everything up..."

(139) Of course, Plaintiff sought assistance through the normal channels, which

36

meant pleading with Defendants Buttram, Dodd, and McClain, who all basically told him the same thing to wit: to just deal with the gangs in the unit as best as Plaintiff could, and they were not going to do any thing about it.

(140) However, by this time Defendant Killingsworth was no longer the Unit manager, and was replaced by Defendant Buttram.

(141) Furthermore, by this time Defendant Mark Hacker, had become a relatively permanent fixture on the S.C.C.F compound as an assistant chief of Security so naturally Plaintiff attempted to request assistance from him.

(142) In a candid conversation with Defendant Hacker, prior to Plaintiff's second series of assaults, he acknowledged that the strategy of enforcing STG policies in the Discovery and Enterprise housing units, while letting it flourish in the Colombia, Apollo and Gemini housing units, was sort of a "safety value" strategy that the Administration used, to control inmate behavior.

(143) In his own words Defendant Hacker stated that "....we control the assholes where we need to, and let them run wild, where no body gives a fuck.."

(144) By *assholes* Defendant meant *gang members* and by *where nobody*

37

*gives a fuck*" he meant to imply "*housing units, like Colombia, Gemini and Apollo*", filled with inmates with gang affiliated inmates with lengthy sentences and drug problems, that were really not on any bodies radar or a cause for great concern.

(145) Plaintiff must reiterate how blatant and candid these defendant's were in their admissions regarding the shockingly chaotic and unbelievably unprofessional manner in which C.C.A governed it's prisons in general, and S.C.C.F. In particular.

(146) Indeed, Hacker on a separate occasion, after the second series of assaults flatly told Plaintiff Carter that at C.C.A. The "...motto is simple .. the less we got to bump heads with inmate and staff the less money our bosses have to spend...." and he also specifically stated " that's how Nashville want's it no money no fuss...."

(147) Once again reinforcing the basic position that C.C.A's corporate governance protocol dictated that violent STG affiliated inmates be allowed to roam and control various sectors of the prison, because doing so required less expenditures and dedicated resources (i.e. trained staff, segregated housing units, incident reports documenting violent STG related attacks, etc..)

38

(148) Once again, the evidence is irrefutable that by this time, Defendant's Lindamood, Hacker, Dodd, McClain, Dan Deavers, and Buttram knowingly and intentionally *refused to enforce, the STG and classification policies* that they had at their disposal to avoid the several a instances of assault and resulting injuries that Plaintiff Carter suffered as a result of rampant out of control STG activities at S.C.C.F.

(149) Therefore, this shows that Defendant's Chapman, Hacker, Dodd, McClain, Dan Deavers, and Buttram knowingly allowed the pervasive gang activity that permeated Columbia A and B, Gemini, and Apollo.

### BLACK MOLD PROBLEMS:

(150) After his arrival, plaintiff was assigned to a permanent cell, in Columbia B- and was forced to live in the cell, wherein Plaintiff noticed black mold on the walls, floors and ceiling.

(151) On various occasions while assigned to his cell, Colombia-B 118 it smelled horrible, and immediately after eating it Plaintiff would get really sick and vomit.

(152) Also on the floors, walls and ceilings where Plaintiff specifically slept,

(153) Around this time, Plaintiff began to have problems with breathing, really

39

bad and long headaches, dizziness, and chest pains, and this was due to the black mold.

(154) However, after being moved to RDAP in discovery, the cells were slightly better, in terms of sanitation and protection from these mold spores.

(155) After being transferred to the annex, the cells were even slightly better there, in terms of sanitation and protection from these mold spores.

(156) However, after his return form the annex once again Plaintiff was exposed to the black mold in both his cell and the housing unit in general; at which time, Plaintiff began to have problems with breathing, really bad and long headaches, dizziness, and chest pains, and this was due to his reintroduction to an environment permeated with this black mold.

(157) Plaintiff wrote grievances regarding his difficulty breathing, the headaches, chest pains, and the conditions of the cell about how filthy they are, his skin rashes, and his mistreatment.

(158) Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram were all told of the conditions of this cell, and yet the still refused to move plaintiff.

(159) Despite filling out sick call after sick call request to be seen due to medical problems caused by the black mold, plaintiff was never consulted or given

40

10

any treatment.

(160) To this day plaintiff still suffered from headaches, vomiting spells, skin rashes, dizziness and difficulty breathing, and his condition is getting worse.

***Specific Proof of the Intent and willful decisions of Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Killingsworth, Dodd, McClain, and Buttram to down play and not respond reasonably to the exploding violence and pervasive risks of injury to Plaintiff Carter at S.C.C.F.***

(161) Plaintiffs avers that so rampant and pervasive is gang violence in TDOC and CCA operated institutions that not even the staff members are safe.

(162) Indeed, in February 2015, the institution was locked down due to a gang member attempting[2] to rape a female guard after jamming his cell door locking mechanism, in Zone 2.

(163) Indeed Correction's officer Charlette James, suffered multiple stab wounds, when a gang affiliated inmate attempted to force her to perform oral sex on him during count and after the inmate *was able to come out of his cell by jamming the locking mechanism*, while the institution was on lock down.

**(see Attached Exhibit #4 Site's Violence Add to problem,** *Tennessean.,*

---

2 Discovery B where this attack happened used to be the transient Housing Unit for all new arrivals. However, as of February 2015 it was converted to a Federally funded veterans and 50 and over pod. So all gang activity is strictly prohibited in this unit.

41                                             41

August 3rd, 2015; Tom Wilemon); see also Attached Exhibit #14

Attached Exhibit #14 Memo Regarding February 2015 attempted

Rape and Murder of S.C.C.F. Officer James in Discovery Unit.)

(164) After this incident Jason Medlin, a rather tall bold headed middle aged Caucasian gentlemen, regional director for mid south Region of Correction Corporation of America, was dispatched to south Central correctional Complex.

(165) And he was specifically told by Plaintiff, during the times inmates were able to exit the cells and go to chow and consult with him, about the gang problem.

(166) However, Jason Medlin stated to plaintiff that: "...there was no gang problem[at S.C.C.F]..." and that Plaintiff would have to work with his unit team to solve any problems he was having at the institution.

(167) Once again despite being specifically told by plaintiff of the truly shocking extent of STG activity and the pervasive threat this activity posed, Defendant Medlin specially and knowingly refused to take Plaintiff serious; and in a condescending manner told Plaintiff Carter that he knew for a fact that "S.C.C.F was not being ran according to the standards established in

44

Nashville..."

(168) Plaintiff specifically asked Defendant Medlin to order S.C.C.F. Staff to stop the rampant STG activity and isolate the gang members or at the every least transfer plaintiff to yet a minimum security annex, where the STG policies are enforced, however these request were flatly denied by defendant Medlin.

(169) Furthermore, in a fit of frustration Defendant Medlin threatened to have Plaintiff Carter locked up in segregation, to which Plaintiff responded "good because there ain't no escorts on lock up.." to which Defendant Medlin simply rolled his eyes and left.

(170) When in a fit of utter anger, Plaintiff Carter demanded to know his name Defendant Medlin told him his name and "...plaintiff could file all the grievances he wanted" because his bosses were quite "pleased" with his job performance history.

(171) In other words, Defendant Medlin told plaintiff that he was doing exactly what his bosses, Defendant's Hininger and Garfingle wanted him to do.

(172) Active knowledge of the facts of pervasive gang activity, violence, threats and extortion, coupled with their flagrant and blatant disregard of held in this unit in 2014 and 2015, is what Defendant Medlin was told about and he

45

flat out refused to assist plaintiff in any way.

(173) Plaintiff avers that for the several weeks he was assigned to Columbia, he was terrorized and violently assaulted, as well as extorted by various violent inmates who belonged to Gang members, referred to officials as STG (security threat group).

(174) Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram failed to act reasonably by ensuring that STG inmates who were easily confirmed and verifiable pursuant to **506.26(VI)(B)(4)(c)(d)(e)(f)(i)**, were separated and segregated from Plaintiff, and could not injure or extort him based on his supposed "breaking security"

(175) Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram failed to act reasonably by ensuring that STG inmates, who were easily confirmed and verifiable pursuant to **506.26(VI)(B)(4)(c)(d)(e)(f)(i),** were prevented from openly, blatantly and wantonly engaging in STG activities such as escorting to the showers, and taking over substantial portions of the housing unit, (i.e whole tiers and staircases. ) and forcing Plaintiff Carter to have to be subject to the control of dominion of other inmates.

(176) Plaintiff avers that these STG inmate generated protocols functioned as the

equivalent of enforceable rules.

(177) And Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram

explicit endorsement of and allowance of these STG inmate generated

protocols, functioned as a de facto custom and policy of S.C.C.F.

(178) Plaintiff avers that the facts of his situation are quite similar to that of **Little**

**v Shelby County 2000 U.S. Dist Lexis 22741**, wherein United States

District Court Judge Turner, found that:

> "...[there was].. a prevalence of gangs within the jail. Judge Turner found
> that gangs such as the Gansta disciples and the Vice lords are present in
> the jail and that they commit many violent acts such as stabbings and
> rapes. The gangs regularly post rules inside the pods for other inmates to
> follow....
> The gangs prohibit non-gang members form approaching the bars closet
> to the location of the guard assigned to that pod so as to prevent the
> inmates from receiving help from the guards or notifying them of what is
> happening in the pods. ..ft nt 9 This rule is the "3 and 15 rule" whereby the
> inmate are forbidden by gang members to go past cells 3 and 15 (which
> are across from each other) because that would put them close enough to
> the bars to communicate with the guard. The guard (i.e. deputy jailer) is
> typically seated in a chair across the hall from the sally port (and 20 to 25
> feet away from the sally port) .
> The gang members also control access to the phones within the pod.
> ....for use exclusively by gang members. The other phone can be used by
> non-gang members only with permission of gang members ..to call family
> to bring them money that can then be extorted by the gang members....the
> gang members also control the televisions in the pods....Gang members
> also require the non-gang members to wash the gang members clothes,
> clean their cells and to do other work for the gang members.. the gang
> members also regularly take the commissary of non gang members..or
> require the non-gang members to purchase items for the gang members.."
> Little v Selby County 2000 U.S. Dist Lexis 22741

(179) Furthermore, Plaintiff Carter absolutely lived in utter fear and terror of being

45

attacked, while he was assigned to Columbia pod. **Gillande v Owens 718 F.Supp. 665, 687, (6th Cir 1989)**("There is proof that inmates live in fear of personal harm. They refuse to identify their attackers ; they are afraid to report incidents to guards. ....the proof of inmate actions is more convincing than the expert's subjective assessments of the degree of fear of tension field by inmates......")

(180) Plaintiff must reiterate that the polices which were in place to prevent all off of these acts were intentionally and knowingly ignored by Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram.

(181) Furthermore, Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram were carrying out the express order and desires of "Central Office", which is to say Defendant C.C.A' corporate headquarters commands, regarding the operation of the facility.

(182) The Defendant's clearly stated that they were carrying out the express commands and operating guidelines of "Central Office," [i.e. Defendant C.C.A's Corporate Headquarters and the officials who governed its policies and operating procedures.]

(183) These Defendant's consist of C.C.A., Damon Hininger, Tony Garfingle, and

4F.                                    16

Jason Medlin, who were directly responsible for providing the instructions and operating guidelines for Defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram.

(184) Although there is no debate that there were official CCA and TDOC policies-on paper which prohibited such actions regarding the pervasive STG activity that was openly condoned and tolerated.

(185) The reality however, was much more dire insofar as the de facto policy that governed every day life and housing unit protocols for plaintiff Carter, rose to the level of a de facto policy; which mandated and required both the Staff and the inmates to absolutely ignore, disregard and violate these policies regarding the pervasive STG activity that was and tolerated.

(186) Thus, Plaintiff avers that he can establish both Municipal and therefore, *Corporate liability*, under *Monell* either because a de facto policy or custom, promulgated by **Correction Corporation of America**, and their staff, (i.e. Defendant's Damon Hininger, Tony Garfingle, Jason Medlin, Chapman, Killingsworth, Dodd, McClain, and Buttram)-in effect required that they ignore, disregard and violate the written policies, which, in and of itself, "***was a custom so pervasive that it became the de facto policy.***" City

47

of St. Louis v Praprotnik 485 U.S. 111, (1988)

(187) In other words, Plaintiff Carter can establish corporate liability for Defendant Correction Corporation of America, and their staff, (Defendant's Damon Hininger, Tony Garfingle, Jason Medlin, Chapman, Killingsworth, Dodd, McClain, and Buttram) based on a custom, because their statements and actions prove irrefutably that the *de facto* policy was to knowingly and intentionally: (i) ignore STG policy; (ii) ignore classification polices against randomly mixing violent STG affiliated inmates and non-affiliated inmates like Plaintiff; and (iii) produce fraudulent reports hiding the true extent of instances of inmate on inmate violence; and (iv) ignore and refuse to enforce polices designed to interdict unfettered gang activity in the form of escorts, extortion, etc.. Miller v. Shelby County 93 F. Supp. 2nd. 892 (Feb. 29th, 2000)

(188) Once again, Plaintiff avers that ".... a "paper" policy cannot insulate a [a corporation like CCA] from liability where there is evidence, as there was here, that the [the corporation] was deliberately indifferent to the policy's violation. See Ware v. Jackson County, 150 F.3d 873, 882 (8th Cir. 1998); see also **Daskalea, 227 F.3d at 433.**("The existence of written policies of a

defendant are of no moment in the face of evidence that such policies are neither followed nor enforced..... That evidence included not only the continued blatant violation of the policy, but also the fact that the policy was never posted, that some guards did not recall receiving it, that inmates never received it, *and that there was no evidence of the training that was supposed to accompany it....*")

(189) Therefore, it did not matter that C.C.A and the TDOC had policies of both it's own internal creation and of the Tennessee Department of Correction, because not only did Defendants C.C.A. Damon Hininger, Tony Garfingle, Jason Medlin, et al, ignore and refuse to implement or compel it's workers to comply with such policies, *it specifically required its on site local employees* such as Defendants Chapman, Dodd, Buttram, McClain, and Lindamood, to *blatantly ignore, disregard and refuse to enforce them as well*.

(190) Plaintiff must reiterate that this custom wasn't merely haphazard, unavoidable and accidental, and resulted because of *some perceived negligent disposition.*

(191) Quite to the contrary, and more importantly this custom *specifically required* that the Defendants *ignore, disregard and refuse to enforce the*

49

49

**CCA and TDOC written policies and Tennessee State laws,** and therefore, such a policy and *de facto* custom, was and still is willful, intentional, and knowing.

(192) Once again every single one of these Defendants at any time of the day can and has looked at their very own video monitors and noticed, visually observed, and directly seen in real time, violent and coordinated STG affiliated inmate activity in the form of escorting, jamming doors, and removing commissary from inmates like plaintiff, and even assaults.

(193) Yet they willfully, voluntarily, knowingly, and intentionally choose to not only allow this, but encourage it by continuing to condone and allow these inmates *carte blanche* to engage in these activities, in broad daylight and in direct violation of the paper policies.

(194) In *Daskalea* the Appeals court found that, there was direct liability to the Municipality, and Corporation alike because:

> The District makes one further attempt at legal jujitsu-trying to turn Daskalea's evidence against her by arguing that the very fact that guards sought to conceal the July 20 incident is proof that the abuse was only undertaken "by a small group of rogue employees, acting surreptitiously." Reply Br. at 16. In Triplett v. District of Columbia, we did note that "cover-up efforts at relatively low levels in the hierarchy not only reduce the likelihood that policymakers will learn of the covert practice, but suggest a belief by the subordinates that their behavior violates established policy." 323 U.S. App. D.C. 421, 108 F.3d 1450, 1453 (D.C. Cir. 1997). But here the misconduct can hardly be described as that of a few "rogues." The

District's own investigative committee charged fourteen guards with "aiding and abetting" sexual misconduct and/or assault, and charged several more--including supervisors and lieutenants--with negligence. Moreover, whatever the participants did to cover up the July 20 incident, the series of bacchanalian nights that preceded it was open and notorious, and the jury could reasonably have concluded that if such behavior were not known to prison policymakers, it was only because of their deliberate indifference to conditions at the Jail. Accordingly, we affirm the jury's verdict against the District under 42 U.S.C. 1983. (supra., 444)

(195) Likewise in the case *sub judicie*, the Defendant's Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, all have access to live video feeds and real time actionable intelligence of the wide spread STG inmate activities going on daily at S.C.C.F..

(196) Plaintiff avers that the facts of his case are similar to Miller v. Shelby County 93 F. Supp. 2nd. 892 (Feb. 29th, 2000), where in the Court found that: "Miller has satisfied the objective prong of Farmer, by illustrating that he was incarcerated under conditions posing a substantial risk of serious harm. Plaintiff has also clearly met the subjective prong by offering considerable evidence that ....officials were aware of a substantial risk of serious harm.....officials knew that the presence of gangs posed a serious safety concern to inmates generally....".

(197) Plaintiff Carter has shown that Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram, acting on behalf of the express orders and corporate

51

guidelines of defendant's C.C.A, Damon Hininger, Tony Garfingle, and Jason Medlin, were well aware of a specif risk to his personal safety and that they failed to act reasonably to those risks.

(198) However, even assuming that Defendant's didn't know of a specific risks, -though they did- Plaintiff would still be entitled to relief, because he can still show that the defendant's were aware of but consciously disregarded a pervasive risk of serious injury, to Plaintiff Carter. Street v Corrections, corp. of Am, 102 F.3d. 810, 815 (6th Cir. 1996) ,( "This court did not however, require a showing of a "specific risk". In Marsh, this court reasoned that prison officials violate the eight amendment when [they are] deliberately indifferent to either *a pervasive risk of harm generally* or a serious risk of assault to a member of an identifiable group...")

(199) Therefore, Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram, acting on behalf of the express orders and corporate guidelines of defendant's C.C.A, Damon Hininger, Tony Garfingle, and Jason Medlin, knew of a pervasive risk of serious harm, caused by the pervasive, unfettered, widespread and wanton activity of STG members at S.C.C.F., indeed they had official policies dealing with and denoting these dangers.

52

(200) And therefore they were deliberately indifferent to a grave risk of serious injury that Plaintiff Carter faced.

(201) Indeed in their public statements, press releases and corporate publications, Damon Hininger, and Tony Garfingle have both been quoted as saying that C.C.A does in effect what the "Commissioner of [Tennessee Department of] Correction" wants, in terms of running and managing S.C.C.F.

(202) Furthermore, Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram, acting on behalf of the express orders and corporate guidelines of defendant's C.C.A, Damon Hininger, Tony Garfingle, and Jason Medlin, intentionally and purposefully disregarded, ignored and refused to implement, the very CCA and TDOC policies put in place to protect non-affiliated inmates like Plaintiff Carter.

(203) Indeed, the Defendants absolutely disregarded, ignored and _**violated their very own policies, in order to save money, reduce budgetary expenditures, and reduce bad press coverage, that comes with the negative press associated with increased statistics of institutional violence.**_

(204) The only issue to be determined, is whether the challenged polices of the defendants caused the damage to Plaintiff Carter. See Garner v. Memphis

53

Police Dept. 8 F.3d 358, 364 (6th Cir. 1993) Doe v Sullivan County, 956 F. 2d. 545, 550 (6th Cir 1992).

(205) In other words, Plaintiff need only establish that there is a casual connection between: (a) the defendants *de facto* polices of intentionally and purposefully disregarding, ignoring and refusing to enforce both official CCA and TDOC policy, and falsifying documents-on the one hand-and: (b) the injuries plaintiff Carter suffered-on the other.

(206) Plaintiff avers that he has proven ***an irrefutable causation*** in this case *sub judicie*, between: (a) Defendant C.C.A. and its subordinates, and TDOC official's, *de facto* policies of purposefully and knowingly: (i) ignoring STG policy; (ii) ignoring classification polices against randomly mixing violent STG affiliated inmates and non-affiliated inmates like Plaintiff; and (iii) producing fraudulent reports hiding the true extent of instances of inmate on inmate violence; and (iv) ignoring and refusing to enforce polices designed to interdict unfettered gang activity in the form of escorts, extortion, etc..-combined with; (b) Defendant Schofield's *de facto* policies of purposefully and knowingly allowing violent STG affiliated inmates unfettered access to the general population and randomly reclassifying both

54

thier _**ineligibility**_ for maximum security placement and the violent physical assaults they commit against inmates like Plaintiff Carter,-that: (c) specifically and directly created the uncontrolled conditions under which Plaintiff Carter was violently assaulted, terrorized, and forced to live.

(207) Or stated simply, Plaintiff Carter avers that he has proven _**an irrefutable causation**_ in this case _sub judicie_, between Defendant C.C.A. and its subordinate, and TDOC official's, _de facto_ policies and the dangerous and uncontrolled contidions, of confinement, that resulted in him being severly injured.

(208) Phrased another way, but for Defendant Schofileds decisions to flood the TDOC with young violent STG affiliated inmates randomly freed from maximum security and gang unit status, and but for his decision to assign them to institutions like S.C.C.F, where they could congregate and engaged in unfettered STG activity Plaintiff Carter would have never been assaulted and injured by the inmates who assaulted him or in the manner for which he was assaulted.

(209) Or stated simply the Defendant's conscious and willful, knowing, voluntary and purposeful decision to: (i) permit rampant and pervasive STG activities,

55

such as escorting, extortion, and violent assaults; and (ii) refuse to segregate violent STG inmates., irrefutably resulted in Plaintiff Carters injuries. Garner v. Memphis Police Dept. 8 F.3d 358, 364 (6th Cir. 1993) Doe v Sullivan County, 956 F. 2d. 545, 550 (6th Cir 1992).

a.) Phrased another way, the multiple attacks on Plaintiff Carter could have been prevented had the defendants, not allowed rampant STG activities like escorting and the control of whole areas of the hosing units by affiliated inmates, which in turn resulted in Plaintiff Carter being accused of breaking security.(id)

b.) Phrased another way, the attack on Plaintiff Carter could have been prevented had the defendants, not inundated and flooded the general population of TDOC prisons with violent STG affiliated inmates, by arbitrarily emptying out maximum security beds, and condoning their participation in STG activities such as escorting and the control of whole areas of the hosing units by affiliated inmates, which in turn resulted in Plaintiff Carter being accused of breaking security.(id)

c.) Phrased another way, the multiple attacks on Plaintiff Carter could have been prevented had the defendants properly classified Petitioner and kept him away from violent STG affiliated inmates in the general compound at S.C.C.F.(id)

d.) Phrased another way, the multiple attacks on Plaintiff Carter could have been prevented had the defendants, not intentionally and

56

consciously made a decision not *to comply with their own mandatory institutional policies, regarding segregation of STG affiliated inmates*.

e.) Phrased another way, the multiple attacks on Plaintiff Carter could have been prevented had the defendants, not intentionally and consciously made a decision not comply with their own mandatory institutional policies, regarding controlled inmate movement and the securing of pod doors, so as not to allow random STG affiliated inmates access to his housing unit.

(210) This is not a case wherein Plaintiff Carter has based his deliberate indifference claims on vague and conclusory statements that Defendants were aware of a dangerous condition or risk. Gibson v Fltz 963 F.2d. 851 (6th Cir. 1992). Nor is it the case where there is only one example of a defendant receiving notice of a substantial risk to inmate safety. Spruce v Sargent. 149 F.3d 783, 786 (holding one document to be insufficient evidence that defendant had the subjective knowledge required under Farmer."

(211) Rather, Plaintiff Carter has and can demonstrate through myriad specific facts and credible evidence from numerous different sources, that Defendants CCA, SCCF Administration officials and TDOC officials were *specifically put on notice that their willful, intentional, knowing and*

*voluntary decisions: (i), to specifically disregard, ignore and refuse to enforce their policies regarding, STG activities, Classification or max placement for violent STG inmates,*; (ii) to specifically refuse to implement controlled movement and proper tier management on a consistently enforced basis; (iii) willfully falsify state documents, official incident reports and forms regarding statistics on violent inmate assaults-**all created a substantial risk to Plaintiff Carters safety, health and welfare.**

(212) Therefore, defendants CCA, SCCF Administration officials and TDOC official's *willful, intentional, knowing and voluntary decisions* to allow violent STG affiliated inmates to engage in rampant and widespread shower escorts and in effect take over whole portions of the housing unit, daily ON CAMARA AND IN PLAIN SIGHT, with no interference or correction or punishment of any kind, created a "substantial risk of serious harm" to plaintiff Carter.

(213) Therefore, defendants CCA, SCCF Administration officials and TDOC official's *willful, intentional, knowing and voluntary decisions* to allowing violent STG affiliated to establish and implement their own security protocols and charge non-affiliated inmates like Plaintiff Carter, with

58

"breaking security", daily ON CAMARA AND IN PLAIN SIGHT, with no interference or correction or punishment of any kind, created a "substantial risk of serious harm" to plaintiff Carter.

(214) Plaintiff Carter avers that defendants CCA, SCCF Administration officials and TDOC official's, failed to take reasonable steps to avoid these known risks to plaintiff-indeed had they responded 'reasonably there would never have been any attacks or injuries or terrorized states of existence on the part of Plaintiff Carter.

### _Simple solutions and reasonable responses that defendant's could have taken to protect Plaintiff Carter:_

(215) Indeed by merely:

> (i) segregating all known and active STG members;
>
> (ii) punishing and isolating those who engaged in STG activities like shower duty escorts;
>
> (iii) enforcing the rules and polices regarding controlled inmate movement so that numerous affiliated gang members could not easily enter into and exit out of pods;
>
> (iv) enforcing the rules regarding secure door and cells, so that violent STG inmates could not enter and exit their cells at random to attack plaintiff Carter;
>
> (v) ensuring that an adequate number of maximum security and close

security beds are provided in adequate numbers to remove violent problematic STG affiliated inmates from general population, so that they couldn't attack plaintiff as they did;

(vi) *not ordering that CCA and other TDOC officials and wardens falsify official state documentation like Disciplinary reports and incident reports,* that falsified the violent assaultive behavior of STG affiliated inmates, as mere petty non-violent rule infractions that require no segregation or maximum security placement-;

(vii) not intentionally shutting down the majority of the isolated STG units, and requiring mandatory segregation of STG affiliated inmates, etc.

- *any of these simple common sense steps would have in fact prevented the numerous assaults, and terror and perpetual fear that Plaintiff Carter consistently lived under and continues to live under until this day*. See Haley v Gross, 86 F.3d 630 , 642 (7th Cir. 1995) "...defendant having observed how volatile the situation was between to cell mates, and their desperate desire to be separated, it was reasonable for the jury to conclude that [defendant] McKee manifested a deliberate indifference to [Plaintiff] Haley's safety by walking away with nary a hint that he intended to do anything about the situation. Deliberate indifference can hardly, be more succinctly demonstrated than by McKee's words as he left that night: "Well,

go ahead, you nigger, burn your black asses. You've got to be in there..")

(216) Plaintiff avers that the comments, actions and words of Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram, acting on behalf of the express orders and corporate guidelines of defendant's C.C.A, Damon Hininger, Tony Garfingle, and Jason Medlin- all evince an irrefutable degree of active knowledge of the situation, regarding out of control STG affiliated inmate activity, and the inherent level of dangerous violence caused by the operation of the S.C.C.F, under and pursuant to the de facto policies set by both Defendant C.C.A, et al., and Defendant Schofield.

(217) Allowing such rampant, blatant, wanton STG activity a like shower duty and escorts to go on, in broad day light, on camera every day all day, was far more than merely negligent conduct.

(218) This decision was willful, intentional and purposeful and was taken by all players on all levels of administrative control and positions of authority from CCA to the TDOC Commissioner Schofield.

*Specific Proof of the Intent and willful decision of TDOC administration to down play the exploding violence and pervasive risks of injury to inmates like Plaintiff Carter in the custody of the TDOC.*

(219) Plaintiff avers that Defendants Derrick Schofield, Tony Parker, and Jason

Woodall, have implemented policies that were directly responsible for the injuries that Plaintiff has sustained, in Columbia housing unit.

(220) Plaintiff avers that Defendants Derrick Schofield, Tony Parker, and Jason Woodall, *have conspired together to totally re-engineer and restructure the Tennessee Department of Corrections*, by expressly ordering or directly arranging for his departmental staff , and Contractors, to:

> (i) release violent STG affiliated inmates off of maximum security randomly, and with no input form the staff who know these inmates records, and propensities for violence;

> (ii) fraudulently convert state documents and incident reports, not to reflect sky rocketing instances of violence that have occurred as a direct result of his policies.;

> (iii) in effect, abandon, and disregard both their own internal policies and the TDOC policies, regarding: (a)  STG activities; (b) reporting and classification of inmate incidence of violence;  and

> (iv) in effect, abandon, and disregard both their own internal policies and the TDOC policies, regarding  inmate classification; and

> (v) in effect, abandon, and disregard both their own internal policies and the TDOC policies, regarding  designation, and classification of STG affiliated inmates segregated from general population wherein non-affiliated inmates like Plaintiff Carter live.

*DEFENDANT'S COMMISSIONER DERRICK SCHOFIELD, TONY PARKER, JASON WOODAL BRYANT WILLIAMS, AND JOEL*

# FOSTER'S, INTENTIONAL DECISIONS TO CREATE A CONDITIONS WHICH CAUSED A PERVASIVE RISK OF SERIOUS INJURY TO PLAINTIFF CARTER:

(221) Defendant Schofield, had specifically, willfully, knowing and intentionally:

    (a.)    shut down/emptied out the majority of:

        (i) Maximum security;

        (ii) close level iv;

        (iii) STG Gang Units; and

        (iv) annex's- in order to save money and stream line operations at the TDOC, and reduce budgetary expenditures

    (b.)    ordered his subordinates, namely Jason Woodal, and Tony Parker to in turn carry out his de facto policies, by ordering wardens through the State of Tennessee:

        (i) not to segregate, isolate or punish violent STG affiliated inmates who engage in violent criminal behavior;

        (ii) falsify violent assaultive incidents of inmate on inmate and inmate on staff assaults at TDOC facilities;

        (iii) misrepresent, obfuscate and hide the sky rocketing instances of violence at TDOC facilities;

        (iv) to operate their prisons despite a chronic level of under-staffing and under-staffing, and to do so by hiding these facts from public officials and other supervisory functionaries

        (v) not to enforce TDOC policies, or the CCA equivalent regulations, *506.25 Security Threat Group Intelligence*; *506.26*

*Security Threat Group program Identification,Placement and operation*; *506.27 Correctional Intelligence Initiative*; *506.14 Housing Assignment* ; *103.02 Incident Reporting*; *502.01 Uniform disciplinary Procedures*, viz a viz *505.02(VI)(A)(1), Definitions of Disciplinary Offenses;* to wit:

> [47.] Participation in Security Threat Group Activities (PGA) (Class A): To organize, promote, encourage, or directly participate in a security threat group or security threat group activity.; [68] Strong-armed Activity (SAA) (Class B): Intimidation or coercion of unwilling inmates to participate in any act.; [69] Strong-armed Robbery; [70] Tampering with Security Device or Equipment ; [72.]Threatening Offender : [75] Violation of TDOC/Institutional Policies (VPR) (Class B or C): Failure to comply with written rules governing inmate behavior. The incident report shall cite the TDOC policy or institutional policy violated, including policy section and subsection numbers; [76] Violation of State Law (VSL) (Class A or B): Any violation of T.C.A.

(c.) Caused over crowing and dangerous conditions at many TDOC facilities, but at S.C.C.F. in particular, by designating it as a time building facility, and requiring hundreds of young violent STG affiliated inmates with lengthy prison sentences be automatically assigned there, with non-STG-affiliated inmates like Plaintiff Carter, to live side by side and inter mixed housing units in general population with nary a thought given to the compatibility of inmates

(d.) ***produced, generated and implemented policies specifically designed to increase the level of pain, suffering, discomfort, agitation and misery*** that inmates in the TDOC experience; to wit:

> (i) forcing inmates to walk in a line with their hands outside of

their pockets with no gloves, in freezing temperatures;

(ii) forcing inmates to wait in line consistently outside in the rain for no reason, other then to make the inmate angry and to feel miserable;

(iii) forcing inmates to be awakened multiple times throughout the evening, purposefully subjecting them to willful sleep deprivation;

(iv) walking with their hands behind their backs on wet slippery surfaces and steps in the cold and rain;

(e.) he's done all this while cutting staff and implementing working schedules that caused an increase in staff reductions of up to 60 percent ( ie on 4 out of 10 required staff members being present), and forcing more violent inmates per squire foot of housing space in the general populations of TDOC prisons, by closing down (i) Maximum security; (ii) close level iv; (iii) STG Gang Units; and (iv) annex's- in order to save money and stream line operations at the TDOC, and reduce budgetary expenditures

(f.) required that Defendant C.C.A. through it's staff (i.e. president and regional directors Damon Hininger Tony Garfinkle, and Jason Medlin, et al,) comply with the letter of his de facto policies and enforce them, particularly at S.C.C.F.

*SPECIFIC PROOF IN SUPPORT OF THE PLAUSIBILITY OF PLAINTIFF'S ALLEGATIONS AGAINST DEFENDANT'S SCHOFIELD, WOODAL, PARKER, WILLIAMS, AND FOSTER'S, INTENTIONAL DECISIONS TO CREATE A CONDITIONS WHICH*

55

## CAUSED A PERVASIVE RISK OF SERIOUS INJURY TO PLAINTIFF CARTER:

(222) Plaintiff would direct this Honorable Courts attention to sworn testimony of former TDOC officials themselves which prove that Defendants Schofileds, acts were knowing, intentional, purposeful, and willful.

(223) Former West Tennessee State Penitentiary Warden Jerry Lester, has testified under oath before a Tennessee State Senate Select committee hearing, that :

> "...[pervasive] violence as a result of sweeping policy changes in State Department of Corrections....an increase in inmate violence [is attributable to] Schofield's decision to reclassify about half of the systems maximum security inmates ...to less costly medium security .... Violence began to escalate with Commissioner Schofield, as a cost saving measure, reduced the number of maximum security beds from approximately 1,000 down to 500 merely with the stroke of a pend. The decisions on who to release from maximum security were made by staff in the central office[in Nashville], not the wardens at the intuitions...."**Attached Exhibit #5 Prisons: violence up, morale Down,** *Tennessean.,* **August 28th , 2015; Richard Locker)**

(224) This decision was willful, intentional and purposeful and was taken by all players on all levels of administrative control and positions of authority from CCA to the TDOC Commissioner Schofield.

(225) In another instance, to show that Defendants Derrick Schofield, Tony Parker, and Jason Woodall, have conspired together to totally under report and hide instances and incidents of institutional violence, we can look to the fact of former Warden Jerry Lester stated that "Derrick Schofiled told wardens

66

56

across the state that ***they would be fired immediately for*** [informing the public about his internal plans of under reporting..].....as wardens [we] were directed repeatedly to review all assaultive and ***violent incidents to reduce.....to a lesser nonviolent offense.*** This was reinforced by daily telephone calls from Assistant commissioner Tony Parker.. In ***Schofields efforts to say that violence was decreasing inside the facilities, often incidents that were clearly assaultive were declassified*** ..." (id)

(226) Warden Lester went on the describe one such incident at West Tennessee State Penitentiary on October 9th, 2012, wherein nine inmates assaulted Warden Jerry Lester himself, resulting in a broken right arm, and torn rotator cuff.

(227) According to Mr. Lester's own sworn testimony: "a week later at a wardens meeting Commissioner Schofield and Deputy Commission Jason Woodall called me outside the meeting, Schofield explained that ***he intended to tell the media no warden was assaulted*** and wanted to make sure, quote, I didn't get my feeling hurt when I heard this[sic]. ***Subsequently the assault charges against all nine inmates were dropped. They were then charged with a nonviolent offense......***"(id)

(228) In many other instances there have been situations wherein Defendants Derrick Schofield, Tony Parker, and Jason Woodal, have conspired together to totally re-engineer and restructure the Tennessee Department of Corrections, by expressly ordering or directly arranging for his departmental staff to blatantly lie about violent assaults and incidents of violent STG activity.

(229) For instance, an inmate at West Tennessee State Penitentiary was brought to an officer with "puncture wounds", the wounds were serious enough that the facility determined an ambulance would not work for transporting the inmate, and instead opted to use a helicopter to airlift the prisoner to "...Lauderdale County Community hospital, *however an internal report, prepared pursuant to Defendant Schofields express directives, deemed the incident type as "illness offense, serious, hospital, and listed no level of violence.*.. This type of report embodies the rampant classification of attacks and assaults within the Tennessee prison system, current and former officers argued during a legislative hearing....." see **Attached Exhibit #6** **Critics: Assault Illustrates Reporting Problems**, *Tennessean.,* September 1st, **2015;** *Dave Boucher*)

68

(230) In expressing his outrage that Defendant Schofield's schemes to alter and fraudulently prepare lower indent reports, *__were not being complied with__*, Defendant Tony Parker, fired off an email berating Wardens because "...some of these prisons have way too many incidents that are not correct [i.e. doctored and reporting artificially low assaults and gang activity..]..." (id) and then went so far as to threaten all state Wardens including Defendant's Chapman that "..*[they would] be held accountable for incident reports.[that accurately reflected the true level of violence..]*.."(id)

(231) Another perfect example of this conduct was embodied in yet another excellent piece of investigative journalism, in a report by David Boucher, in a report entitled "Death of Inmate 81738". ( See **Attached Exhibit #15**__Death of Inmate 81738__, *Tennessean.,* September   2015 ; *David Boucher*)

(232) In this report Mr. Boucher details how an inmate at West Tennessee State prison, in Lauderdale County, was found dead in his cell and the State TDOC official incident report ruled his death was attributable to "...natural causes.." (id).

(233) However, Mr. Boucher completely debunks this highly erroneous and

intentionally fraudulent finding by the TDOC, by examining that actual autopsy report prepared by the State's Medical examiners office, which found _that the inmate had fresh burns on his genitals, numerous broken burns, multiple contusions, and extensive injuries_.

(234) Once again Plaintiff must reiterate that Defendants Derrick Schofield, Tony Parker, and Jason Woodall, have conspired together to totally under report and hide instances of institutional violence, **that were the direct result of Commissioner Schofield's actions and de facto policies.**

(235) Indeed a TDOC official testified that: "In order to make it appear that assaults on staff and inmates are not increasing Commissioner Schofield...has ordered wardens to reduce the number of incidents reported on TOMIS by changing the code of how an incident is documented......the incident will not be coded as an assault....thereby cleansing the data so that assaults appear to be down...rather than increasing as they actually are..." **see Attached Exhibit #7 Tennessee DOC Accused of covering Up Violent Incidents;** *Prison Legal News.,* **March 2013;** *A*lex Friedmann,)

(236) In fact, so blatant and brazen were the collective and direct actions of Defendants Derrick Schofield, Tony Parker, and Jason Woodal, that one

70

State employee frankly declared that these defendants were in fact ordering their staff to violate Tennessee State law.

(237) Indeed Tyler Nelson, a State Correctional officer testified that directives issued by Defendants Derrick Schofield, Tony Parker, and Jason Woodal, dealing with erroneously/falsely reporting violent assaults: "*...is a crime. Falsification of a legal document is a* crime[sic]...*an incident report is a legal document which can be presented as evidence.* For the Commissioner [Derrick Schofield] to have knowingly instructed wardens to have assaults reclassified......**to make the prison system appear safer clearly violates the law[sic]..**" **Attached Exhibit #5** **Prisons: violence up, morale Down,** ***Tennessean.*****, August 28th , 2015; Richard Locker)**

(238) Once again Plaintiff must reiterate that these are not wild-eyed ramblings and psychotic conspiracy theories created in his mind, these are irrefutable and officially documented facts of criminal conduct, committed by Defendants Derrick Schofield, Tony Parker, and Jason Woodall. Neitzke v Williams, 490 U.S. 319, 327, (1989);

(239) Indeed Plaintiff would remind this honorable Court that his allegations are significantly different from, those of the Plaintiff in Riches v Williams, 2007

71

U.S. Dist. Lexis 67446 ("..Plaintiff named tennis players *Venus and Serena Williams*, their father *Richard William*s and the *U.S. Open* and '*poltergeist*" as defendants to his action. Claiming that defendant's Venus and Serena are 'reaching through the T.V. Set to grab him during the U.S; Open' in an "attempted coup of his mind. He Also alleged that the poltergeist is roaming our airwaves and CB radio. And that Richard Williams had a 'beef with him since the Nixon era' and that ...tennis balls used in the U.S. Open are 'electrons and neurons stolen from his head ' and that defendants 'took [Vincent] Van Gogh paintings from him..") *dismissed as frivolous and malicious,*

(240) Plaintiff must emphasize that not only are his aforementioned averments "plausible" in the sense that they possess possess sufficient factual matter, as required by **Ahscroft v Iqbal, 129 S.Ct. 1937, 1949 (2009); and Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)** but they are supported by facts that are both substantive and *absolutely non-frivolous.*

(241) Indeed, Plaintiffs allegations are supported by facts which do not in any way "rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them....." **Denton**

72

v Hernandez, 504 U.S. 25, 31-32(1992). ("..examples of claims lacking rational facts are prisoner petition's asserting that Robin hood and his merry men deprived prisoner's of their access to mail or that a genie granted a warden's wish to deny prisoners any access to legals texts..") (id) See also Dekoven v. Bell, 140 F. Supp. 2d. 748, 756 (E.D. Mich. 2001) ("..plaintiff's claim that his conviction must be set aside since it was ordained by "secular authorities in contravention of the mandates of God as set forth in the Holy Bible' was dismissed as frivolous..")

(242) Even Tennessee State Lt. Gov. Ron Ramsey, believes that there is a critical level of violence and disfunctionalism that plague's Tennessee's Department of Corrections and that these problems arose a a direct result of Defendant's Derrick Schofield, Tony Parker, and Jason Woodall''s departmental policies. (see article <u>Tennessee Prisons in trouble</u>..; *Tennessean*, September 25th, 2013, p.13A; David Harkess.)

(243) Furthermore, Tennessee's House Minority Leader, the Honorable Craig Fitzhugh, actually wrote to Defendant Schofield "..[TDOC workers] all feel strongly that there is a sever disconnect between what they experience on the ground and what the administration in Nashville feels is actually the case. It

73

is my concern that these chronic ..[problems]..are part of a larger plan to privatize our prison system ...." **Attached Exhibit #12** <u>**Guards quit as TDOC queried:**</u> *Tennessean.,* **August 2015 ;** *Richard Locker*)

(244) Representative Fitzhugh went on to specifically state that while Tennessee prisons have traditionally been run effectively, policy changes implemented by Defendant Derrick Schofield, "...have crated a chaotic situation..."(id)

(245) Plaintiff would direct this Honorable Court to review Attached **Exhibit #8 Open Letter to Derrick Schofield, form Human Rights Defense Center; March 8th, 2012;** and **Attached Exhibit #9 Transcript of Nashville Tennessee News Channel 4, WSMV Channel 4, 5700 Knob Road, Nashville Tenn, 37209,** news report, on Prison conditions., which both contain even more detailed allegations regarding Defendants Derrick Schofield, Tony Parker, and Jason Woodall, first hand knowledge of the sky rocketing instances of violence which began as soon as these defendants' started to implement a Department wide *de facto* policy of: <u>*in effect intentionally, knowingly, and willfully violating established TDOC policies on reporting of violence, inmate assaults, STG activity suppression, inmate classification, etc..*</u>

74

(246) Plaintiff must reiterate that every single one of the named Defendants has access to the footage recorded every day all day, in the housing units at S.C.C.F. and TDOC facilities, and they actively watch the cameras, and only comment occasionally on this such as the amount of inmates that might be in a pod at a given time-and are actively and consciously aware of the fact that TDOC and CCA's policy's on STG activity, classification and inmate movement ARE BEING intentionally unforced and ignored, *as a matter of routine practice.-as a result of their de facto customs and policies*. See **Schoppel v Schrader 2009 WL 1886090 * 6-7 (N.D. Ind. June 30th, 2009)** (".allegations that County Council [which is analogous to a private corporation] knew that the jail was understaffed, provided inadequate medical care as a result, and did not have a classification system that would identify prisoner's with medical problems, and that these factors caused a prisoner's death, and was deliberately indifferent in not providing funding to remedy these problems, sufficiently plead a deliberate indifference claim.); see also **Chao v Ballista 630 F. supp. 2d., 170, 177(D.Mass. 2009)** "..specific factual allegations of "repetitive, long-lasting sexual abuse in prisons along with public attention given to sexual abuse in prisons

75

generally, supported a claim that prison officials, including Commissioner, were deliberately indifferent...")

(247) But not one time has a single one of these defendants at any time done anything reasonable to (i) stop the organized STG acts of the majority of inmates, escorting to the showers and violently attacking inmates like Plaintiff Carter for violating security; (ii) moved to uset up a segregated unit for STG inmates who activity engage in STG activity; (iii) remove the violent inmates from the general population wherein Plaintiff Carter resides.

(248) The decision not to enforce their own written policies is purposeful, intentional, willful and done with their full knowledge and desire of these defendant's

(249) Plaintiff avers that this is a test book example of wide spread systemic deliberate indifferent to a known serious risk of serious injury.

(250) Failure to segregate an inmate with violent tendencies is negligent, **Marsh v Arn, 937 F.2d. 1056, 1061 (6th Cir. 1991) however,** what's going on in the case sub judicie, far exceeds any perceived negligence and has metastasized into a full fledged malignant tumor of systemic deliberate indifference furled by a malicious intent to cause inmates to suffer extreme discomfort and

76

misery, while confined in TDOC facilities under the management and control of Defendant's Schofield, et al.

(251) Plaintiff would even go so far as to say that Defendant Schofiled et al, have knowingly and intentionally run afoul of the very dictates and holdings of the land mark *Grubb's* decision which prompted a Federal take over and monitor of Tennessee's prison system in the early 1980's.

(252) In Grubbs v Bradley, 552 F. Supp. 1052; 1982 U.S. Dist. LEXIS 16298 (M.D. Tenn. 1982), the Honorable U.S. District Court Judge Morton, wrote

> "....One aspect of the problem at [TDOC] .........Many areas of the prison compound simply are not designed for proper surveillance, but are, instead, virtual blind spots that render consistent surveillance impossible. These areas are obviously prime candidates for violent episodes, and in fact provide the loci of a number of incidents identified in the record.
> Beyond problems inherent in the ...[TDOC].., the guards there are, in large measure, substantially under trained. Although a state statute requires that correctional officers receive two weeks' inservice training within six months of their entry on duty, past compliance with that law has not been exemplary. Even when training is provided, the evidence strongly suggests that the sessions are woefully short, both in terms of hours of training and in the topics on which instruction is offered. Without question, the training provided to guards at [TDOC facilities]...is inadequate preparation for dealing with the security needs of the institution, including the right of inmates to be kept reasonably safe from violent attacks.
> .......the proof shows a sufficient connection between an improper classification system and a protected constitutional right, such as the right to be reasonably free from excessive violence, there may be just cause for court intervention in the proper case.
>
> ......At the present time, the court is convinced that inmates housed at TSP, FP and BMP live in an environment "where violence and terror reign," Woodhous, supra, at 890, and are subject to the constant threat of violence and sexual assault. Jones v. Diamond, supra, at 1373. Violence of every description is commonplace in each of those prisons, and the

77

security staff is ineffective to afford the inmates adequate protection. Considering all the evidence, the court concludes that this inability to control violence and to protect inmates at [TDOC facilities] ......amounts to cruel and unusual punishment in violation of the Eighth Amendment.

As noted, supra, the causes of prison violence are myriad. They include overcrowding, idleness, a classification system that fails to identify and segregate violence-prone inmates, insufficient numbers of guards, insufficient training of guards, improper use of dormitory housing, prison design and undoubtedly others. (at ..1129)

(253) Therefore, Defendants Schofields, Parker, Woodal, Williams, and Foster's conduct, and concomitant de facto policies, which they have implemented and enforced, violate the very legal basis of the consent decree which the *Grubbs*, case produced.-and which freed the Tennessee Department of Corrections from federal oversight. (see Grubbs. v. Bradely 821 F.Supp. 496 (May 14th, 1993)  (vacating remedial orders, injunctions and terminating litigation [because]....... This class action has now been in litigation for well over ten (10) years and it has been four years since the Court accepted and approved the matrix plan and timetable. The record in this actions demonstrates the dramatic, proven progress the defendants have made in operating Tennessee's corrections facilities..")

(254) In vacating the prior remedial orders the Court found that "..the fifth .... condition of confinement that was found to be unconstitutional in 1982, pertained to personal safety. In 1982, the Court concluded that the

78

defendant's inability to control violence and protect inmates at ...TDOC facilities amounted to cruel and unusual punishment in violation of the Eighth Amendment, [*Grubbs*, supra at 1078-81, 1091-92,1101-02, 1128 and 1132] ....Court finds that the defendants have attempted in food faith to address through a various ... measures the [address]....these problems ......") (id;. 501)

(255) In other words, in *Grubbs*, the Federal Court ordered the State to submit to the authority of a Federal Monitor, in order to ensure the correction and amelioration of *the very conditions that have been re-created by the conduct and concomitant de facto policies of Defendant Schofield, Parker, Woodal, Williams, and Foster.*

(256) In Daskalea v. District of Columbia, 343 U.S. App. D.C. 261, 227 F.3d 433, 442 (D.C. Cir. 2000) the court acknowledged that a "'paper' policy cannot insulate a municipality from liability where there is evidence . . . that the municipality was deliberately indifferent to the policy's violation."

(257) Indeed Plaintiff Carter has in fact identified copious measures which could have been employed to curtail the dangerous conditions of confinement, caused by the defendants .Hicks, 45 F. Supp. 2d at 933 (citing, as a basis for

79

granting the defendants' motion for summary judgment, the failure of the plaintiffs "to identify any measure which could have been employed to curtail the inmate's conduct but was deliberately withheld by the defendants").

(258) Once again, Plaintiff avers that "…. a "paper" policy cannot insulate a [a corporation like CCA] from liability where there is evidence, as there was here, that the [the corporation] was deliberately indifferent to the policy's violation…" See Ware v. Jackson County, 150 F.3d 873, 882 (8th Cir. 1998) ("The existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither {227 F.3d 443} followed nor enforced."). That evidence included not only the continued blatant violation of the policy, but also the fact that the policy was never posted, that some guards did not recall receiving it, that inmates never received it, and that there was no evidence of the training that was supposed to accompany it…." *Daskalea* 227 F.3d 433; 227 F.3d 443

(259) Therefore, it did not matter that C.C.A and the TDOC had policies of both it's own internal creation and of the Tennessee Department of Correction , because not only did Defendants C.C.A. Damon Hininger, Tony Garfingle,

30

Jason Medlin, intentionally ignore and purposefully refuse to implement or compel it's workers to comply with such policies; these Defendant's also *required their* on site local employees such as Defendants Chapman, Dodd, Butram, McClain, Deavers, Hacker, and Lindamood, to blatantly ignore, disregard and refuse to enforce these policies well.

(260) Plaintiff must reiterate that this refusal to enforce these polices was and still is mandatory, willful, intentional, and knowing., *__not negligent nor unavoidable and accidental.__*

(261) Once again every single one of these Defendants at any time of the day can and has looked at their very own video monitors and noticed, observed, directly seen in real time, violent and coordinated STG affiliated inmate activity in the form of escorting, jamming doors, and removing commissary from inmates like plaintiff, and even assaults.

(262) Yet they willfully, voluntarily, knowingly, intentionally chooses to not only allow this, *but to literally require it by continuing to condone and allow these inmates, as a matter of de facto policy*, to have *carte blanche* to engage in these activities, in broad daylight, *on camera every day,* and in direct violation of the paper policies.

(263) In *Daskalea'* the Appeals court found that, there was direct liability to the

Municipality because:

> The District makes one further attempt at legal jujitsu-trying to turn Daskalea's evidence against her by arguing that the very fact that guards sought to conceal the July 20 incident is proof that the abuse was only undertaken "by a small group of rogue employees, acting surreptitiously." Reply Br. at 16. In Triplett v. District of Columbia, we did note that "cover-up efforts at relatively low levels in the hierarchy not only reduce the likelihood that policymakers will learn of the covert practice, but suggest a belief by the subordinates that their behavior violates established policy." 323 U.S. App. D.C. 421, 108 F.3d 1450, 1453 (D.C. Cir. 1997). But here the misconduct can hardly be described as that of a few "rogues." The District's own investigative committee charged fourteen guards with "aiding and abetting" sexual misconduct and/or assault, and charged several more--including supervisors and lieutenants--with negligence. Moreover, whatever the participants did to cover up the July 20 incident, the series of bacchanalian nights that preceded it was open and notorious, and the jury could reasonably have concluded that if such behavior were not known to prison policymakers, it was only because of their deliberate indifference to conditions at the Jail. Accordingly, we affirm the jury's verdict against the District under 42 U.S.C. 1983. 5

(264) Likewise in the case *sub judicie*, the Defendant's Corrections Corporation of

America, Damon Hininger, Tony Garfingle, Jason Medlin, all have access

to live video feeds and real time actionable intelligence of the wide spread

STG inmate activities going on daily at S.C.C.F..

(265) Furthermore, they are more then aware of the violence that permeates their

institution, not only because they have been specifically forewarned by

Plaintiff Carter, in his specific situation, but also by looking at the media

and news-reports that come from their institution in Clifton, Tennessee . (**see**

32

Attached Exhibit #4 <u>Site's Violence Add to problem,</u> *Tennessean.,*
August 3rd, 2015; Tom Wilemon)

(266) In addition to this, Defendants Corrections Corporation of America, Damon
Hininger, Tony Garfingle, and Jason Medlin, have created and enforced a *de
facto* policy and custom, which requires that the defendants, turn a willful
blind eye to the sky rocketing instances of violates that are ravaging the
TDOC in general and South Central Correctional facility in particular.

(267) Indeed, S.C.C.F has become a time building institution, with a majority of
violent STG affiliated inmates with life sentences, at the same time that
Defendants Corrections Corporation of America, Damon Hininger, Tony
Garfingle, and Jason Medlin, have agreed to in effect, abandon, and
disregard both their own internal policies and the TDOC policies, regarding:
(i) STG activities; (ii) reporting and classification of inmate incidents of
violence; (iii) inmate classification and compatibility analysis; and (iv)
designation, and classification of STG affiliated inmates segregated from
general population wherein non-affiliated inmates like Plaintiff live.

(268) This in turn creates a pervasive risk of serious bodily harm, which happened
to befall Plaintiff Carter, when he was assaulted on several different

occasions, by STG affiliated inmates for breaking their security, while –with the express permission of defendants-they were exercising control over portions of the housing units Plaintiff was assigned to.

(269) This wanton and rampant exercise of STG affiliated inmate control over the housing units was specifically allowed and facilitated, in turn by the willful actions and explicit permission of Defendant's Chapman, Killingsworth, Dodd, McClain, Hacker, Deavers, and Buttram, who acted in concert and in direct compliance with the expressed wishes and directives of Defendants Corrections Corporation of America, Damon Hininger, Tony Garfingle, and Jason Medlin.

(270) And it was Defendant's Corrections Corporation of America, Damon Hininger, Tony Garfingle, and Jason Medlin., who acted who acted in concert and in direct compliance with the expressed wishes and directives of Defendants Derrick Schofield, Tony Parker, Jason Woodall, and Joel Foster, Bryant Williams,

(271) This is not a case wherein, Plaintiff is stating that Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, merely failed to stop these flagrant abuses of policies and the concomitant

84

assaults that resulted because of this failure to enforce TDOC and CCA's own policies.

(272) Quite to the contrary, Plaintiff Carter is specifically alleging and the facts bare out, that Defendant's Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams not only were aware of the general custom of ignoring and refusing to enforce TDOC and CCA's own STG and Classification policies, *but that they actively encouraged, explicitly authorized, approved and knowingly acquiesced, in the unconstitutional conduct of the offending subordinate, with respect to these specific courses of conduct.*

(273) This line of conduct, is expressly the type of conduct that is expressly called for in order to impose supervisory liability on Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, as well as Defendants Corrections Corporation of America, Damon Hininger, Tony Garfingle, and Jason Medlin.

(274) Indeed, the so-called "supervisory liability" test was established in Bellamy v. Bradley, 729 F.2d 416 (6th Cir.), cert. denied, 469 U.S. 845, 83 L. Ed. 2d 93, 105 S. Ct. 156 (1984), and our sixth Circuit held that:

> [the section] 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. Id. at 421 (emphasis added). "At a minimum," we held, a "plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." Id. This holding followed section 1983's requirement that the person sought to be held accountable actually have "caused" the deprivation, and was based on the fact that the individual defendants had supervisory responsibilities

(275) Just like the Plaintiff in **Taylor v Michigan Dep't of Corrections, 69 F.3d 76, 84 (6th Cir 1995),** Plaintiff Carter can show that Defendant's "failed to take reasonable steps to ensure that vulnerable [non-affiliated STG inmates like himself] would not be.." assigned to share housing units with a majority of violent STG affiliated inmates, who are, in turn allowed to blatantly engage in organized STG activities on camera in broad daylight, on a daily basis, with no repercussions or adverse consequences what so ever.

(276) In *Taylor* the Court held that in the Michigan Dept or Corrections, the Warden was not merely a supervisor of those to which a delegation of authority had been made, *but was responsible for their conduct.* It was well known that sexual assaults occurred in the prison system and there was also evidence that the Warden had read the inmates file before a prior transfer and know of this particular inmates vulnerability. Thus there was a question

86

of fact to present to the jury, as to his liability for being deliberately indifferent.

(277) In the case *sub judice,* there is more than enough evidence from which a rational trier of fact could infer that Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, were not merely individuals who acted in a supervisory position, above those to which a delegation of authority had been made, but instead were direct participants, directly responsible for both the de facto policies/customs and conduct, which resulted in plaintiff Carter's injuries.

(278) In other words, Defendant's Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin ,Chapman, Killingsworth, Dodd, McClain, Hacker, Lindamood, Deavers, and Buttram, to whom Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams,, had delegated authority, were not only failing to follow and enforce both TDOC and CCA policies, as well as statutorily law and contract, but they were doing this expressly because Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams,, wanted it done.

K7

37

(279) In this instance, Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, were not merely supervisors, haphazardly sitting on the sidelines blissfully unaware of the flagrant unconstitutionality of the conditions of S.C.C.F, but were instead, officials who were directly responsible for both enforcement of Tennessee State law and compliance with TDOC policy and state contracts, and _**who chose to ensure that these policies were not enforced or followed-as a matter of routine practice**_.

(280) Plaintiff Carter avers that the case sub judice, is virtually indistinguishable from the facts presented in Hill v. Marshall, 962 F.2d 1209 (6th Cir. 1992), cert. denied, 125 L. Ed. 2d 687, 113 S. Ct. 2992 (1993),

(281) In Hill, the Plaintiff was an inmate who was diagnosed positive for the tuberculin bacteria. After he was transferred to another facility, he was repeatedly denied the preventive medicine previously prescribed to him.

(282) Hill filed a 1983 action against certain officials at the Southern Ohio Correctional Facility, including Terry Morris, the Deputy Superintendent of Treatment. Just as in the present case, Morris objected to the imposition of liability, arguing that he could not be held liable for actions taken in his supervisory capacity and that the plaintiff did not plead and prove Morris'

direct personal involvement. The Sixth Circuit **rejected** this argument, stating:

> Here, by contrast, Morris is charged with abandoning the specific duties of his position--reviewing and responding to inmates' complaints about medical needs--in the face of actual knowledge of a breakdown in the proper workings of the department. <u>Hill does not seek to hold Morris vicariously liable for the head nurse's misconduct.</u> ***Rather, Morris personally had a job to do, and he did not do it***. His failure to do his job resulted directly in a violation of the plaintiff's Eighth Amendment right. 962 F.2d at 1213. Hereby, contrast, Morris

(283) Coming back to the facts of the case *sub judicie*, Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams,, were not merely supervisors, they all had important jobs to do, with respect to ensuring that Plaintiff Carter was not subjected to living conditions which presented a pervasive risk of serious injury, due to flagrant actions of officials at S.C.C.F, who refused to enforce, follow or obey, Tennessee State law TDOC policy and their state contracts, with regard to classification, STG activity suppression and prevention, and adequate prison population management.

(284) Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, were not merely supervisors, they all had important jobs to do, and they did not merely fail to do these jobs, *but specifically and intentionally refused to do them.*

(285) Of stated simply, it was the "active performance of the Defendant's [Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams,] individual job functions which directly resulted in [plaintiff Carters'] constitutional injury..." Lowe v. Vadlamudi, 2009 U.S. Dist Lexis., 21302, 6th Cir. March 16th 2009)

(286) It was the coordinated and intentional decision of Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, to wit:

> (i) inundate S.C.C.F. with young violent gang members, sentenced to life in prison, by emptying out the majority of their maximum security housing beds , and sending these inmates to S.C.C.F.;
>
> (ii) inundate S.C.C.F. With young violent gang members, by designating S.C.C.F as a time building institution;
>
> (iii) order C.C.A. and TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, not to classify inmates as assaultive or charge them with assaults, when they violently attack inmates, like they attacked Plaintiff Carter;
>
> (iv) order C.C.A. and TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood,  to classify violent assaults by gang affiliated inmates, as staff inmate provocation or horse playing-which left these inmates with violent tendencies free to mingle among the general inmate population vulnerable to their predations;
>
> (v) ensure that C.C.A. Staff at S.C.C.F. Never enforced their S.T.G.

Policies or classification polices designed to prevent violent STG inmates from preying upon and attacking inmates like Plaintiff Carter. (vi) *produce, generate and implement policies specifically designed to increase the level of pain, suffering, discomfort, agitation and misery* that inmates in the TDOC experience; to wit: (i) forcing inmates to walk in a line with their hands outside of their pockets with no gloves, in freezing temperatures; (ii) forcing inmates to wait in line consistently outside in the rain for no reason, other then to make the inmate angry and to feel miserable; (iii) forcing inmates to be awakened multiple times throughout the evening, purposefully subjecting them to willful sleep deprivation; (iv) walking with their hands behind their backs on wet slippery surfaces and steps in the cold and rain;

(vi) do all this in an environment of generally increasing institutional instability, management unaccountably and regulatory opacity

-that resulted in Plaintiff being assaulted on various occasions, by violent STG affiliated inmates, who were able to exercise utter and complete control over housing units, and implement their own inmate rules and protocols.

(287) Thus, Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, role's far exceeded mere supervisory roles, because they were all directly and personally involved in the alleged unconstitutional activity. *Dunn. v. State of Tennessee* , 697 F.2d. 121, 128 (6th Cir. 1982). ("What is required is a casual connection between the

misconduct complained of and the official sued.".

(288) Indeed, Defendant Foster the TDOC liaison, at around the early part of 2015 has commented that "he had no choice in the matter" and "couldn't ship" Plaintiff off when plaintiff asked him to ship him to an annex or lower security institution, such as Deberry Special Needs Facility, wherein the STG policies, proper and adequate classification procedure and mandatory prison population management, *were enforced and followed.*

(289) He also stated that "...gangs and violence are the price you pay for coming to prison my friend..", and that even though he wasn't the contract manger, "..He [the contract manager Mr. Bryant Williams] would tell him the same thing.."

(290) TDOC Liaison Joel Foster also said that ".....gangs are the new reality, especially under our boss [TDOC commissioner] and these inmates now a days......" and that "...just try to be careful as best as you can..."

(291) Plaintiff had written various letters to Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, informing them of all of the problems that he was having both with Gang members, and his medical treatment, and his grievances not being processed properly.

(292) Furthermore, it was the decision of Defendants Derrick Schofield, Tony Parker, Jason Woodall, specifically to: (i) empty out the maximum security bunks and reintroduce violent STG inmates back to general population-willy nilly and with no input from the Warden or Classification staff that knew how dangerous these inmates were; while (ii) simultaneously funneling the majority of thee violent STG inmates to S.C.C.F (a newly designated time building facility) where Plaintiff Carter was assigned-that resulted in plaintiff being violently assaulted.[See **Attached Exhibit #5** **Prisons: violence up, morale Down,** *Tennessean.,* **August 28ᵗʰ , 2015; Richard Locker); ]**

(293) Furthermore, it was the decision of Defendants Derrick Schofield, Tony Parker, Jason Woodall, specifically not to classify inmates as violent or assaultive, or to ensure that STG policies were enforced.-that resulted in plaintiff being violently assaulted.

(294) As this was all part and parcel of Defendants Derrick Schofield, Tony Parker, Jason Woodall's plan to: (i) save money be cutting back on staff and beds allocated to house violent STG inmates; *and (ii) ensure that inmates were subjected to many more harsh conditions;* see **MiddleBrook v Tennessee,**

93

**2008 U.S. Dist. Lexis 37680**; (".... MLCC Warden, Deputy Warden and Unit Manager all held liable for deliberate indifference, when there was adequate proof that they were aware of factual situation and conditions giving rise to 8th amendment violations.)

(295) Thus, Plaintiff Carter is not saying that Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, are liable for deliberate indifference simply because they "were informed of plaintiff's problems, and failed to act" per se, but that they are liable for plaintiffs injuries and problems, because these injuries were specifically caused by the direct decisions and willful acts of these Defendants personally , to wit:

> (i) inundate S.C.C.F. with young violent gang members, sentenced to life in prison, by emptying out the majority of their maximum security housing beds , and sending these inmates to S.C.C.F.;
>
> (ii)   inundate S.C.C.F. With young violent gang members, by designating S.C.C.F as a time building institution;
>
> (iii) order C.C.A. and TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, not to classify inmates as assaultive or charge them with assaults, when they violently attack inmates, like they attacked Plaintiff Carter;
>
> (iv) order C.C.A. and TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood,  to classify violent assaults by gang affiliated inmates, as staff inmate provocation or horse playing-which left

94

these inmates with violent tendencies free to mingle among the general inmate population vulnerable to their predations;

(v) ensure that C.C.A. Staff at S.C.C.F. Never enforced their S.T.G. Policies or classification polices designed to prevent violent STG inmates from preying upon and attacking inmates like Plaintiff Carter.

(vi) *produce, generate and implement policies specifically designed to increase the level of pain, suffering, discomfort, agitation and misery* that inmates in the TDOC experience; to wit: (i) forcing inmates to walk in a line with their hands outside of their pockets with no gloves, in freezing temperatures; (ii) forcing inmates to wait in line consistently outside in the rain for no reason, other then to make the inmate angry and to feel miserable; (iii) forcing inmates to be awakened multiple times throughout the evening, purposefully subjecting them to willful sleep deprivation; (iv) walking with their hands behind their backs on wet slippery surfaces and steps in the cold and rain;

(vi) do all this in an environment of generally increasing institutional instability, management unaccountably and regulatory opacity

(296) Indeed, Defendants Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, were aware of and consciously disregarded the very real risk of serious injury that Plaintiff Carter faced due to the conditions of confinement these Defendant's actions' created. **Bishop 636 F.3d at 766,** ("..to establish a constitutional violation based on failure to protect, a prison inmate must first show that the failure to protect from risk

of harm is objectively sufficiently serious.")

(297) In the case sub judicie, there is no doubt that Defendants Derrick Schofield,

Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, were aware

of and consciously disregard the very real risk of serious injury that Plaintiff

Carter faced, *at the hands of literally thousands of STG affiliated inmates, ,*

with ***a significant portion thereof, fresh out of maximum security*** *and*

*allowed to implement their own protocols during times* they exercised

completely dominion over various portions of the housing united he was

confined in, while at S.C.C.F.

(298) Plaintiff avers that the facts of his case, mirror those of numerous other cases

in the State of Tennessee like those of ***Scotty Lee Girardin v Arvil***

***Chapman, 2014 U.S. Dist Lexis 93309,*** wherein just last year on July 8th,

2014 the Honorable U.S. District Court Judge William J Haynes, Jr, sitting

in the Columbia Division of the Middle district held that:

> "Here, Plaintiff alleges facts of two assaults and a subsequent threat that
> are sufficient to show a deprivation that objectively is 'sufficiently serious".
> The court also takes judicial notice that a number of gang-related
> stabbings have taken place at SCCC over the past year. In addition, in
> response to the denial of Plaintiff's request to be placed in protective
> custody, Plaintiff refused his cell assignment , and incurred a disciplinary
> charge. These allegations of collateral consequences to avoid release into
> general prison population, give plausibility to Plaintiff's allegations of
> serious threats to his personal safety..
> Plaintiff also alleges facts that Defendants Micheal Parrish and Rhonda

96

Staggs knew of and continued to disregard the risks to Plaintiff's personal safety by denying his request for protective custody. *Plaintiff's factual allegations state colorable claims against Defendant's Arvil Chapman and Derrick Schofiled in their individual and official capacities*, insofar as the complaint gives rise to a reasonable inference that the **Defendants, as a policy matter, have failed to take any effective steps to provide for the person safety of inmates and guards at SCCC, including Plaintiff...**

In sum the Court concludes that plaintiff states viable claims for relief..."

(299) Plaintiff's case is also similar to other cases in the State of Tennessee wherein both TDOC commissioner Schofield and CCA staff have been held liable for failure to reasonably respond to serious risks of injury that inmates face due to the defendant's failure to reasonably respond to their STG affiliated inmate problems. See **Jenkins v Corr. Corp. Of Am, 2014 U.S. Dist Lexis 150730 (October 21st, 2014)** (".Plaintiff stated colorable claims against Defendants Derrick Schofield, CCA, .....Arvil Chapman for their alleged knowledge and deliberate indifference to the imminent and serious risk to Plaintiffs personal safety due to gang violence at SCCF.....") ; see also **Jenkins, Lexis 67138** ("..CCA 's policy relied upon Plaintiff and other inmates to address inmate gang threats to their personal safety. The Court concludes that Plaintiff states a colorable Claim against CCA. ...") see also **Terrance Burke v. Tenn. Dept of Corrections. 2015 U.S. Dist. Lexis 34251,** ("..Plaintiff has stated colorable claims against Defendants, Derrick

Schofield, Jason Woodal, for conditions of confinement...")

**Specific Proof of the Failure of Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams to ensure the proper training and adequacy of Staff at S.C.C.F. Resulted in sky rocketing violence and pervasive risks of injury to Plaintiff Carter**

(300) Plaintiff avers that the Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams failed to take adequate measures to ensure that Staff at S.C.C.F. were properly and adequately trained and supervised.

(301) Plaintiff also avers that the conditions that resulted from the Defendants failing to take adequate measures to enforce STG policy designed to stop the organized STG activity, also resulted in, and from, a Failure to adequately train its staff and personnel, namely the Pod officers and seniors who worked those areas-these claims, in turn are against the corporation C.C.A. and subsidiary S.C.C.F that they operated in direct violation of the 8th amend.

(302) Plaintiff avers that on the nights in question wherein he was assaulted, their was inadequate staffing to ensure that inmates did not have *carte blanche* to

enter into and out of the housing units.

(303) There were no supervision on checks on the Gates that are supposed to be manned at all times, so as to strictly regulate the flow of STG affiliated and other inmates.

(304) Indeed due to the de facto policy of allowing uncontrolled random inmate movement, the defendant's created the conditions wherein multiple STG affiliated inmates, could enter the Plaintiff housing unit and assault him.

(305) Plaintiff clearly acknowledges that it is not enough for him, as a strict § 1983 plaintiff, to identify conduct attributable to Corrections Corporation of America, but rather he must and he has:

> "......demonstrate[d].... that, through its deliberate conduct, the [ Corrections Corporation of America] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.Brown, 520 U.S. at 404, 117 S. Ct. at 1388 (emphasis in original). Thus, to recover, the Plaintiffs must show that [their] civil rights were violated pursuant to and as a direct result of the [city's] official policy or custom. The burden in this regard requires a showing that the unconstitutional policy or custom existed, that the policy or custom was connected to the [city], and that the policy or custom caused [their] constitutional violation. Napier v. Madison County, Ky., 238 F.3d 739, 743 (6th Cir. 2001) (internal citations omitted).

(306) In the case sub judice, under these specif claims alleging failure to train officers or to investigate, plaintiff Carter has clearly established that Defendants Correction Corporation of America, Damon Hininger, Tony

99

Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams failure "in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants[like himself]." See Ferguson v. Leiter, 220 F.Supp.2d 875, 884 (N.D. Ohio 2002) (quoting Canton, 489 U.S. at 389, 109 S. Ct.1197); Humes, 154 F.Supp.2d at 1363.

(307) Plaintiff avers that the facts of his case ***are distinguishable*** from those of Jacqueline Walker, v. Norris, 917 F.2d 1449; 1990 U.S. App. LEXIS 19176, wherein the Administrix of the estate of an inmate, killed at a TDOC prison by another drunk inmate, had failed to properly allege or demonstrate Liability under a failure to train theory of liability.

(308) In Walker, the Sixth Circuit Court of appeals in upholding the dismissal of supervisory liability against Defendant's Dutton and Norris:

> The plaintiff further contends that the district court should have allowed the supervisory liability verdict to stand based upon the participation of defendants Norris and Dutton in formulating flawed policies. Specifically, the plaintiff charges both defendants with installing the door to the unit that prevented Fails from reaching the safety of the prison yard. The unrefuted testimony of warden Dutton, however, established that prison policy included posting a guard at the door to intervene in cases of emergency. Here, defendant Ritz was guarding the door, yet failed to take the type of action anticipated by prison policy. Thus, the record is bereft of evidence to suggest that the policy devised by warden Dutton concerning the door caused or facilitated Eggleston's attack upon Fails. Similarly, the record contains no support for the plaintiff's assertion that defendants Norris and Dutton were responsible for an informal policy permitting prisoners to

100

produce and consume the alcoholic beverage known as "julep." Norris testified that alcoholic beverages were explicitly forbidden, and Dutton explained the prison policy requiring discipline of inmates found to be intoxicated. The plaintiff merely established that Dutton, in attempting to ensure security within the prison, gave guards some discretion in dealing with intoxicated inmates. As the district court concluded, neither Norris nor Dutton could reasonably be found to have promulgated or tolerated an informal policy of allowing inmates access to julep. The entry of a directed verdict on the plaintiff's theory that Norris and Dutton instituted unconstitutional policies is AFFIRMED.

(309) Whereas in the instant case, *supervisory liability theory is a viable* and colorable claim against Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams based on their joint participation in formulating flawed and constitutionally infirm de facto policies; to wit: *a de facto policy which mandated and required: (i) both the Staff and the inmates to absolutely ignore, disregard and violate these policies regarding the pervasive STG activity that was and tolerated.*; (ii) the random and arbitrarily release of hundreds of violent STG affiliated inmates into the general compound wherein Plaintiff resided; (iii) the purposeful and intentional falsification of violent incident reports in order to reduce over bad press, that comes with the negative press associated with increased statistics of institutional violence.; (iv) closing down maximum security beds and gang unit bends, in order to save money, reduce budgetary

101

expenditures; (v) refusing to provide for adequate training and supervision of newly hired guards, which would ensure that these guards enforced the STG activity policies, so as to prevent attacks and incidents like those that befell Plaintiff Carter.; see also **Brown v. Budz, 398 F. 3d 904, 916, (7th cir 2004)** ("..failure to train staff to properly segregate inmates, enforce STG policy designed to stop the organized gang activity sufficiently states a failure to protect claims..")

(310) Indeed Plaintiff Carter would direct this Court to review the unrefuted and undisputed credible evidence in support of his contentions, in the form of sworn testimony from several Tennessee State official's.

(311) Indeed former State penitentiary Warden Jerry Lester stated:

> " a decision by [Defendant Schofield]...to reclassify maximum-security prisoners and integrate them with the medium security population as a cost saving measure has increased violence directed at both inmates and offices in state prisons.....The plan included reclassifying maximum security prisoners deemed dangerous enough to be in their cells 23 hours per say and require two guards to escort them as "close security prisoners.....wardens were then directed to reclassify close security prisoners again, and designate them as medium security prisoners, and place them in general population where there is just one guard for every 128 prisoners. When assaults against staff and inmates began to increase as a result, the department reclassified 'assaults' as provocation to avoid documenting the increase in violence...
> [Warden] Lester said the situation is now "unmanageable.."....'the driving force is money...We wardens were directed to integrate [violent STG affiliated inmates] into medium [security] populations....where _they continued their predatory behavior amount inmates who simply wanted to do their time and go home_..."**see Attached Exhibit #16: Violent Inmates**

102

(312) However, it's not simply former high ranking state prison officials like Warden Lester, who have exposed Defendant's Schofield et al., malicious plan to subject inmates like Plaintiff Carter to system wide deliberate indifference.

(313) Quite to the contrary, current State law makers themselves have blatantly and candidly admitted that Defendant Schofield's actions and management plans have created uncontrolled levels of sky rocketing violence and an every present pervasive risk of serious harm to inmates like Plaintiff Carter.

(314) State Rep. Mike Stewart D-Nashville, has flatly stated that:

> "...[Defendant Schofields plans] ...ha[ve] led to an increase in violence and instability at prisons across the state.....the turmoil could prompt federal oversight, like there was in the 1980's when federal authorities noted similarly misclassifications in the state's prisons and conditions were considered cruel and unusual punishment......". (id)

(315) Once again, these are not Plaintiff Carter's own words, these are the objective and independent factual findings of a sitting Tennessee State official, who in the course of his normal duties as a State Representative in the state legislature, has given his own view that *the conditions that have been created by the conduct **and concomitant de facto policies of*** Defendant

Schofield, Parker, Woodal, Williams, and Foster. et al, are the **very same conditions,** which the Federal Court in *Grubbs,* found to be a justifiable basis for remedial orders, requiring the Tennessee Department of correction to submit to the authority of a Federal Monitor, in order to correct the unconstitutionality of Tennessee's prison system.

(316) The plaintiff further contends that this Honorable U.S. District court should allow the supervisory liability theory to apply, based upon the participation of Defendants Forster and Williams, because it was their job specifically to ensure that state inmates housed at S.C.C.F were properly protected by properly trained S.C.C.F staff, in compliance and accordance with TDOC policy and Tennessee State law.

(317) Therefore, Foster and Williams, in formulating their own *de facto* policies, to refuse to do their jobs and enforce applicable TDOC policy and state law, specifically, placed the plaintiff Carter in harms way and caused in his injuries.

(318) Or stated another way, the *de facto* policies of Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, along with, Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and

Bryant Williams-resulted Plaintiff being the victim of multiple violent attacks by STG affiliated inmates who the defendant's knew about and allowed to roam free, with no segregation or control at all.

(319) Indeed Defendant's Schofield, Parker, Woodal, et al., have implemented de facto policies which, *inter alia*, required that violent known STG affiliated inmates, be randomly released to "...general population where there is just one guard for every 128 prisoners..." and that this has created a system which ".. is now "unmanageable.."...and that .'the driving force [was] money...[and that] ...wardens were directed to integrate [violent STG affiliated inmates] into medium [security] populations....where *they continued their predatory behavior amount inmates who simply wanted to do their time and go home*..."see **Attached Exhibit #16: Violent Inmates Reclassified to Save Money,** *Tennessean.,* October, 2015; *Anita Wadhwani*)

(320) This perfectly describes Plaintiff Carter's situation, because had it not been for Defendant's intentional decision to implement these *de facto* polices of randomly releasing randomly selected STG affiliated inmates into totally "uncontrolled" and "unmanageable" environments within the contexts of

105                                    105

S.C.C.F. as a time building institution, Plaintiff would have never been assaulted, by violent STG affiliated inmates who had been released into general population with him.

(321) Specifically, plaintiff avers that Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams *purposefully ignored and refused to enforce*, policies that were expressly designed to prevent the wide spread pervasive risk of serious bodily injury that Plaintiff Carter was subjected to via rampant and explicitly condoned STG affiliated inmate activity.

(322) Plaintiff avers that our 6ᵗʰ Circuit's holding in Green v Bowels, 361 F.3d 290, 294 (6ᵗʰ Cir. 2004), is quite informative for it states:

> "....where a specific individual[ or groups of individuals like known violent STG members] pose a risk to a large class of inmates [like unaffiliated middle aged inmates like plaintiff Carter], that risk can also support a finding of liability..
> Ultimately as this Honorable court must acknowledge, "..it does not matter whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." (Farmer, 511 U.S. At 843]. .. As these cases reveal, deliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant not known in advance of attack), or in the alternative, as assailant's predatory nature (though the identity of the ultimate victim not known in advance of attack.." ) (id.)( citing Cury v Scott, 249 F.3d. 493, 507-08) (6ᵗʰ cir. 2001)

108

(323) Our sister Circuit Court went on in, **Brown v. Budz, 398 F. 3d 904, 916, (7**[th]

**cir 2004),** to hold that:

> Thus, a deliberate indifference claim may be predicated on custodial offic[ial's] knowledge that a specific individual poses a heightened risk of assault to a large class of detainees..notwithstanding the officials failure or inability to comprehend in advance the particular identity of this individuals ultimate victim...accordingly , we reject defendants suggestions that deliberate indifference requires either the threaten detainees to advise this custodians of a pending threat or a custodial officer to know in advance the identity of the particular plaintiff at risk. Deliberate indifference may also be predicated on the custodians knowledge of an assistant's predatory nature.." (Brown, at 917)

(324) Plaintiff Carter avers that in the instant compliant in order to survive summary judgment he only need show that a finder of fact could conclude that his vulnerability as an older non-affiliated inmate, placed in the mist of Housing unit full of 100's of STG affiliated inmates known for extorting, assaulting, and psychically attacking and robbing non-affiliated inmates, -constituted a substantial risk to his safety, of which the defendants Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams were aware of.

(325) Or or in the alternative there is evidence from which the fact finder could conclude that STG inmates known for extorting, assaulting, and psychically attacking and robbing non-affiliated inmates, without any segregation or

Case 1:15-cv-00090   Document 6   Filed 10/13/15   Page 109 of 162 PageID #: 293

other protective measures- presented a substantial risk to other inmates, (ie. Plaintiff Carter) in the S.C.C.F. Housing units, of which the defendants Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams were aware of.

(326) Plaintiff avers that he has done this quite thoroughly and convincingly. See Price v Sasser, 65 F.3d 342; at 347; "Farmer established that risk of danger particular to the individual was not required.." see also **Taylor v Michigan Dep't of Corrections, 69 F.3d 76, 84 (6th Cir 1995)** ("summary judgment inappropriate, because there was a factual dispute regarding the wardens knowledge of, *inter alia*, existence of wide spread sexual assaults, and the likelihood of small youth prisoner, were more vulnerable to attack than another..... knowledge that this particular prison would be attacked was not necessary..")

(327) Even assuming that Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams attempted to argue that they were unable to ameliorate the unsafe conditions, due to budgetary

Case 1:15-cv-00090   Document 6   Filed 10/13/15   Page 110 of 162 PageID #: 294

constraints-which thwarted their collective attempts to secure additional funds to improve physical plants, expand recruitment efforts, provide adequate staff & training, and institute and implement polices that would have reduced violence- they still would be liable under 1983 for failing to reasonably respond the pervasive risk of serious injury..

(328) Plaintiff Carter has presented copious evidence: (1) that Defendants failed to ensure that direct subordinates followed the policies that were implemented as a result of the *Grubbs*, decision' and (2) of specific, low-cost actions that Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, could have taken and that, if undertook, would have prevented the wide spread threat of institutionalized gang violence.

(329) This evidence supports a finding that Defendant's Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams knowingly "failed adequately to supervise correctional officers up to the [Warden level and the] lieutenant level[,] resulting in corruption and

incompetence among the officers and a lack of reasonable protection of inmates." LaMarca, 662 F. Supp. at 665; see Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (suggesting that inadequate staffing may rise to deliberate indifference as to prisoner safety (citing Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980, cert. denied, 50 U.S. 1041, 101 S. Ct. 1759 (1981))); cf. Jordan v. Gardner, 986 F.2d 1521, 1530 (9th Cir. 1993) (en banc) ("It is simply not enough to say . . . that [the official] gave the issue a great deal of thought. The 'sufficiently culpable state of mind' necessary to find deliberate indifference has more meaning than that.").

(330) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, have failed to provide adequate staffing and training, as a matter of policy, and have allowed unfettered violence, and wanton gang activity to take over their prison, at S.C.C.F.

(331) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams have failed to ensure that adequate training and staffing requirements were met at S.C.C.F., in order to

110

ensure that their STG policies were followed and implemented properly and in conformity with reasonable standards of effectiveness.

(332) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, have purposefully inundated S.C.C.F. with young violent gang members, sentenced to long periods of confinement in prison, -as S.C.C.F has been designated a time building institution.

(333) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams, have purposefully inundated S.C.C.F. with young violent gang members, sentenced to life in prison, by closing down and emptying out the majority of their maximum security housing beds and then sending these inmates to S.C.C.F.

(334) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams have purposefully inundated S.C.C.F. with young violent gang members, sentenced to life in prison, by

Case 1:15-cv-00090   Document 6   Filed 10/13/15   Page 113 of 162 PageID #: 297

closing down and emptying out the majority of their STG/gang unit behavioral modification units, used to house these violent gang members.

(335) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams have purposefully inundated S.C.C.F. with violent STG affiliated inmates while ordering both C.C.A. And TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, not to classify inmates as assaultive or charge them with assaults, when they violently attack inmates, like they attacked Plaintiff Carter.

(336) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams have purposefully inundated S.C.C.F. with violent STG affiliated inmates while ordering both C.C.A. And TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, to **produce, generate and implement policies specifically designed to increase the level of pain, suffering, discomfort, agitation and misery** that inmates in the TDOC experience; to wit: (i) forcing inmates to walk in a line with their hands outside of their pockets with no gloves, in freezing

temperatures; (ii) forcing inmates to wait in line consistently outside in the rain for no reason, other then to make the inmate angry and to feel miserable; (iii) forcing inmates to be awakened multiple times throughout the evening, purposefully subjecting them to willful sleep deprivation; (iv) walking with their hands behind their backs on wet slippery surfaces and steps in the cold and rain;-*all of which only: (i) increased the level of agitation frustration, and anxiety; and (ii) fueled the incentives that STG affiliated inmates have to continue their violent behavior patterns.*

(337) Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams have purposefully inundated S.C.C.F. with violent STG affiliated inmates while ordering both C.C.A. and TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, to do all this in an environment of generally increasing institutional instability, management unaccountably and regulatory opacity-which only fuels the incentives that STG affiliated inmates have to continue their violent behavior patterns.

(338) Plaintiff Carter'ss attack at the hands of young gang members in his housing

113

units, was direct result of: (i) Commissioner Schofield's and Dep. Commissioner Parkers', and Woodal's decision to inundate S.C.C.F. with young violent gang members, sentenced to life in prison, emptying out the majority of their maximum security housing beds , and the sending these inmates to S.C.C.F. maximum security housing beds , and sending these inmates to S.C.C.F.; (ii) Commissioner Schofileds and Dep. Commissioner Parkers', and Woodal's decision to inundate S.C.C.F. With young violent gang members, by designating S.C.C.F as a time building institution; (iii) Commissioner Schofileds and Dep. Commissioner Parkers', and Woodal's decision to order C.C.A. And TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, not to classify inmates as assaultive or charge them with assaults, when they violently attack inmates, like they attacked Plaintiff Carter; (iv) Commissioner Schofiled's and Dep. Commissioner Parkers', and Woodal's decision to order C.C.A. And TDOC wardens, to wit: Arvil Butch Chapman and Cheryl Lindamood, to classify violent assaults by gang affiliated inmates, as staff inmate provocation or horse playing-which left these inmates with violent tendencies free to mingle among the general inmate population vulnerable to their predations; (v) Commissioner

Case 1:15-cv-00090  Document 6  Filed 10/13/15  Page 116 of 162 PageID #: 300

Schofield's and Dep. Commissioner Parkers', willful decision not to ensure that C.C.A. Staff at S.C.C.F. ever enforced their S.T.G. Policies or classification polices designed to prevent violent STG inmates from preying upon and attacking inmates like Plaintiff Carter.

(339) Plaintiff Carter's attack at the hands of young gang members in his housing units, was direct result of: (i) Arvil Butch Chapman and Cheryl Lindamood,'s decision to allow young violent gang members to engage in STG activity, unrestricted, and with impunity; (ii) Arvil Butch Chapman and Cheryl Lindamood's, decision to follow Commissioner Schofileds and Dep. Commissioner Parkers', unlawful and unconstitutional order not to classify inmates as assaultive or charge them with assaults, when they violently attack inmates, like they attacked Plaintiff Carter; (iv) Arvil Butch Chapman and Cheryl Lindamood's, decision to classify violent assaults by gang affiliated inmates, as staff inmate provocation or horse playing-which left these inmates with violent tendencies  free to mingle among the general inmate population vulnerable to their predations; (v) Arvil Butch Chapman and Cheryl Lindamood's willful decision not to ensure that C.C.A. Staff at S.C.C.F.  enforced their S.T.G. Policies or classification polices designed to

115                                       115

prevent violent STG inmates from preying upon and attacking inmates like Plaintiff Carter.

(340) Indeed Defendants Correction Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, and Derrick Schofield, Tony Parker, Jason Woodall, Joel Foster, and Bryant Williams failed to take any basic common sense steps to address and minimize the following problems, such as:

(1) improper and inadequate staff training . . . ,

(2) a staff out of control who did not report rapes, assaults, and illegal activities up through the chain of command

(3) failure to supervise staff and administer measures which would "minimize the chance of error and maximize the full satisfaction of constitutional protection," in (i) not allowing gangs to engaged in blatant, unadulterated flagrant STG activities, in full view of the camera, 365 days a year 24 hours a day, and in (ii) permitting the violent assaultive, known STG affiliated inmates to engage in such illegal and blatant behavior . . . ,

(4) Schofileds and Parker's shocking failure to employ any standard procedure to investigate incidents of alleged STG activity, and assaults,

[(5)] Schofileds and Parker's failure to provide inmate movement controls thus reducing the casual egress and ingress of aggressive assailant affiliated inmates, within the open dormitories, and general

118

population, wherein plaintiff Carter was forced to reside

[(6)] Schofileds and Parker's failure to transfer known assailants or inmates who should have been known to be STG affiliated out of General population.

[7] Schofileds and Parker's willful failure and intentional decision not to designate an institution, specifically designed for and designated as an STG affiliation camp, to ensure that non-affiliated and affiliated inmates do not mingle on the compound.

(341) Indeed Defendant's Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin, Warden Arvil "Butch" Chapman, Cheryl Lindamood, Danial Dodd, Hacker, Dan Deavers, and McClain, failed to take any basic common sense steps to address and minimize the following problems, such as:

(1) improper and inadequate staff training . . . ,

(2) a staff out of control who did not report STG acts of violence, rapes, assaults, and illegal activities up through the chain of command

(3) failure to supervise staff and administer measures which would "minimize the chance of error and maximize the full satisfaction of constitutional protection," in (i) not allowing gangs to engaged in blatant, unadulterated flagrant STG activities, in full view of the camera, 365 days a year 24 hours a day, and in (ii) permitting the violent assaultive, known STG affiliated inmates to engage in such illegal and blatant behavior . . . ,

117

(4) the collective shocking failures of Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin, Warden Arvil "Butch" Chapman, Cheryl Lindamood, Danial Dodd, and Shane McClain, to employ any standard procedure to investigate incidents of alleged stg activity, and assaults,

[(5)] the collective failure of Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin, Warden Arvil "Butch" Chapman, Cheryl Lindamood, Danial Dodd, Shane McClain, to provide inmate movement controls thus reducing the casual egress and ingress of aggressive assailant affiliated inmates, within the open dormitories, and general population, wherein plaintiff Carter was forced to reside

[(6)] the collective shocking failures of Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin, Warden Arvil "Butch" Chapman, Cheryl Lindamood, Danial Dodd, and Shane McClain to transfer known assailants or inmates who should have been known to be STG affiliated out of General population.

[7] the collective shockingly willful failures of Corrections Corporation of America, Damon Hininger, President of C.C.A., Tony Garfingle, Jason Medlin, Warden Arvil "Butch" Chapman, Cheryl Lindamood, Danial Dodd, Deavers, Hacker and McClain and their intentional collective decisions not to designate an institution, specifically designed for and designated as an STG affiliation camp, to

ensure that non-affiliated and affiliated inmates do not mingle on the compound.

(342) Therefore, even assuming that Plaintiff was uninjured he would still state a claim for dangerous conditions and failure to protect. ("...the absence of an actual attack on the plaintiff *is not fatal to his constitutional claim in light of this allegations that the staff in question acted in a manner that was deliberated indifferent to a substantial risk of serious harm to his safety or acted in a manner that was purposefully exacerbated or created a substantial risk of serious harm to his safety*...") Shye v Melton 2014 U.s. Dist Lexis, 167980 (Dec 3rd, 2014), (citing Farmer at 845) Benefield v. McDowall, 241 f. 3d 1267, 1272, (10t Cir. 2001). Thompons v County of Medina Ohio 29 f.3d 238, 242 (1994) ; see also Woods v Lecerez, 110 f.3d 1215, 1225, (6th Cri. 1997) ("..intentional conduct by a prison staff member that incites or invites inmates to inflict harm upon another inmate violates constitutional standards...: ") Northington v Jackson 973. f.2d. 1518, 1525 910th Ci. 1992); Mc.Gill v Duckworth, 944 F.2d 344, 347,.

(343) Our circuit has consistently held that, even assuming that plaintiff Carter had not been the victim of a series of serious assaults that physically injured him, he would still be able to maintain a personal safety claims under the

139

113

either amendment.., because he could (and must) establish that he reasonably feared sch an attack. **March v Arn, 937 F.2d 1056, 10662, n. 5, Martin v White 742 F.2d 469, 474; Wilson v Seiter 893, f.2d 861, 865 (6th Cir. 1990).**

(344) In Wilson, plaintiff inmates had claimed that the practice of housing mentally ill inmates in plaintiffs prison dorms placed the plaintiffs in fear for their safety. The Sixth circuit granted summary judgment, nothing that "..the absence of allegations of prior physical violence involving any inmate supporting appellants claims lead us to conclude that their fear is not reasonable.." 893 F.2d at 865.

(345) However, in the case sub judice, Plaintiff Carter can show, beyond a reasonable doubt that such fears are more than reasonable, they are quite intelligent and well founded, based on the profound history of violence at C.C.A prisons and South Central in-particular; **See attached Attached Exhibit # 4   Site's Violence Add to problem,** *Tennessean.,* **August 3rd, 2015; Tom Wilemon).** (Showing where two inmates where killed to due gang affiliations and one staff member was sexually assaulted by another gang member.), see also **Attached Exhibit #15 Death of Inmate 81738,**

120

*Tennessean.*, September 2015 ; *David Boucher*); see also see **Attached Exhibit #16:** <u>Violent Inmates Reclassified to Save Money,</u>, *Tennessean.*, October, 2015; *Anita Wadhwani*)

(346) Plaintiff avers that it's so bad that an inmate literally wrote to a judge this Middle district asking for help to protect him form gangs. See **also Attached Exhibit #4** <u>Site's Violence Add to problem,</u> *Tennessean.*, August 3rd, 2015; Tom Wilemon); See also Attached Exhibit #5 <u>Prisons: violence up, morale Down,</u> *Tennessean.*, August 28th , 2015; Richard Locker); See also Attached Exhibit #6 <u>Critics: Assault Illustrates Reporting Problems,</u> *Tennessean.*, September 1st, 2015; *Dave Boucher*); See also Attached Exhibit #7 <u>Tennessee DOC Accused of covering Up Violent Incidents;</u> *Prison Legal News.*, March 2013; Alex Friedmann,); See also Attached Exhibit #8 **Open Letter to Derrick Schofiled, form Human Rights Defense Center; March 8th, 2012;** See also Attached Exhibit #9 **Transcript of Nashville Tennessee News Channel 4, WSMV Channel 4, 5700 Knob Road, Nashville Tenn, 37209, news report, on Prison conditions.;** See also **Attached Exhibit #10** <u>Slain Guard's Family</u>

sues over prison riot, *Associated Press.*, September 2014; Holbrook

Mohr)

(347) Thus, Plaintiff Carter can show and has shown, not only an actual assault that occurred and a resulting degree of physical injury, but even in the absence of such, he could still show a "..sufficient inferential connection between the [actions of Defendants TDOC and C.C.A in allowing unfettered STG activity and dangerously arbitrary classification system] and inmate violence to justify a reasonable fear for personal safety.." Thompson v Cty of Median, at 243

(348) Suffice it to say that Plaintiff has shown that:

a.) **Due to the dangerous and uncontrolled conditions of confinement Defendants allowed Plaintiff to be continually subject to physical assaults and abuse from other inmates in overcrowded housing units, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**

b.) **Due to the dangerous and uncontrolled conditions, Defendants allowed violent gangs and Security threat group organizations to control whole units and tiers in the housing units, which resulted in Plaintiff being violently assaulted and seriously injured, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**

c.) **Due to the willful and intentional acts of Defendants to save money, stream line operations, and achieve political ends of appearing tough on crime-the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was subjected to a-substantial and ever present-pervasive risk of serious harm in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**

d.) **Due to the willful and intentional acts of Defendants to save**

122

money, stream line operations, and achieve political ends of appearing tough on crime-the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was violently assaulted and seriously injured, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.

e.) Due to an inherent failure to properly train staff, the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was subjected to a-substantial and ever present-pervasive risk of serious harm, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

f.) Due to an inherent failure to properly train staff, the Defendant's created dangerous and uncontrolled conditions wherein Plaintiff was violently assaulted and seriously injured, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.

g.) Defendant's denied Plaintiff adequate medical treatment of a serious medical condition; to wit: a acute repository distress, and associated symptoms caused by the lack of sanitary conditions and black Mold in the cells wherein he was confined-in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

h.) Due to the dangerous and unsanitary conditions of confinement Plaintiff suffered from sever medical problems, that to this day have never been properly treated, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

i.) Due to the dangerous and unsanitary conditions of confinement Plaintiff contracted and suffers from, a series of debilitating and painful skin rashes that to this day have never been properly treated and left his skin pot marked and disfigured, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.

Thus Concludes Claims (a) - (i)

## Claims (j) - (l)

**j.)** **Due to the dangerous and unsanitary conditions of confinement Plaintiff suffered a debilitating injury, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**

**k.)** <u>**Due to the inadequate medical treatment Plaintiff received, his sever back and neck injury was never properly treated, nor was Plaintiff ever given any adequate pain medication to help him deal with the terrible and excruciating pain he was suffering from, in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**</u>

**l.)** <u>**Due to the willful and intentional acts of the Defendants to save money and stream line operations the Defendant's willfully and intentionally denied Plaintiff necessary treatment for his chronic injuries and serious medical condition, in direct violation of his 8th Amend U.S. Const. Rights against cruel and Unusual punishment.**</u>

<u>**Subjection to a Serious Health Risk:**</u>

(349) Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram failed to act reasonably by ensuring that Plaintiff Carter was not subject to living conditions that posed a reasonable threat of serious bodily injury.

(350) The water pipes in Plaintiff's cell began to leak in early September 2014.

(351) The leak was first reported on 09/11/2014 and to C/O Lopez the same night.

(352) Plaintiff also reported the leak to Mrs. Ishmel, Secretary for Mr. Peterson over RDAP, the following morning.

124

(353) Because he specifically feared that he could and would slip and fall because of the water that would pool on the floor, Plaintiff Carter also reported the facts to Chapman, Killingsworth, Dodd, McClain, and Buttram; each of whom in turn, specifically denied his request to move him out of the cell until such time that that leak could be fixed.

(354) Plaintiff continued to report the leak verbally to C/O Lopez, Mrs. Ishmel, and C/O Cook and it was documented on work orders to maintenance every day up until 09/21/2014.

(355) C/O Cook called maintenance on 09/21/2014 and was informed by them that they would be by to fix the leak, however, Defendant Bill Morgan, the maintenance supervisor, was "on [his] way home [and] it [would] .." not fix the leak any time soon.

(356) The leak continued to be reported on work orders to maintenance every day following, and to the various defendant's Chapman, Killingsworth, Dodd, McClain, and Buttram, who failed to act reasonably by ensuring that plaintiff was moved.

(357) Plaintiff also reported the leak to Mr. Forster a TDOC employee, and Mr. Forster failed to assist Plaintiff in changing his cell location or ensuring that

125

the leak was fixed.

**Subjection to the Subsequent Physical Injury:**

(358) On 9/30/2014 at around 1:40 pm, as Plaintiff was leaving his cell Plaintiff stepped into a large pool of water and fell, bumping his head and injuring his spine, his neck, and his lower back-aggravating his already sever and extensive array of injuries that he suffered as a result of multiple assaults.

(359) The response team did not respond to the situation until around 2:00 pm, roughly twenty minutes later.

(360) Plaintiff was taken to the E.R. and was kept there for 4 hours, sitting in a cold room waiting to hear from a medical professional.

(361) Plaintiff was assigned some Ibuprofen by a nurse for pain and given an x-ray, after which Plaintiff was released back to his pod.

**Subjection to a Lack of Adequate Medical Treatment:**

(362) Plaintiff was in continual pain and attempted to get medical attention from the nurses from 10:00 pm until 2:00 am on the same day.

(363) Beginning on 10/01/2014, Plaintiff began filling out sick-call slip after sick-call slip in an attempt to get medical treatment in the following weeks.

(364) On several occasions Plaintiff reported to Defendant Mrs. Rashti after filing

a sick-call slip and informed her that Plaintiff was still in pain and was in need of further medical treatment, specifically in the form of medication and physical therapy.

(365) On those occasions when Plaintiff spoke with Defendant Mrs. Rashti, the complaint Plaintiff listed on the sick-call slip was never addressed.

(366) She would review the sick call slip and record an entirely different prognosis than what was actually wrong, namely that his lower back, spine, and neck were injured and that Plaintiff needed medical treatment for the same.

(367) She would state that his pain was due to a cyst and proscribe ibuprofen as a pain reliever although Plaintiff continued to inform her that that was not the underlying problem.

(368) On several occasions Plaintiff reported to the pill window/med line to receive the ibuprofen, although it would not resolve the underlying problem, and was informed that his name was not on the list to receive any prescription medication.

(369) As time progressed and Plaintiff continued to receive inadequate medical treatment, Plaintiff began to notice signs that his condition was worsening.

(370) On 10/03/2014, his eye sight began to be diminish and his his neck, spine,

127

and lower back were in constant pain.

(371) On 10/04/2014, while still in sever pain, Plaintiff attempted to report to the pill window/med line only to find that Plaintiff had missed it because his tier was on lock-down.

(372) On 10/05/2014, Plaintiff was unable to sleep the previous night because Plaintiff was unable to get the ibuprofen from the pill window/med line.

(373) On 10/07/2014, Plaintiff was in continual pain all night so Plaintiff filled out a sick-call slip and turned it in.

(374) On 10/08/2014, Plaintiff was told that his name was not on the list for medication nor the list for sick-call, so Plaintiff turned in another sick-call slip.

(375) On the same day, Plaintiff informed a staff member that Plaintiff needed to get medication for his pain so he called the clinic to see if Plaintiff could report to them. His attempt was met with no success.

(376) On 10/09/2014, Plaintiff was told again that his name was not on the list for sick-call, so Plaintiff filled out another sick-call slip and turned it into the Chief of Security.

(377) On 10/10/2014, Plaintiff reported to sick-call and was referred to a nurse.

128                    128

She informed him that Defendant Dr. Robert Coble had reviewed his chart, determined that Plaintiff had a pinched nerve which was affecting his lower back, spine, and neck, and ordered that Plaintiff receive muscle relaxers and Tylenol. She stated that the medication would be available on Monday.

(378) On the same day, Plaintiff was scheduled for an appointment with the eye doctor.

(379) On 10/14/2014, Plaintiff received his proscribed medication, however, after taking them Plaintiff determined that the pain medication was of no effect.

(380) On 10/28/2014, Plaintiff was seen by Defendant Dr. Robert Cobble again and was proscribed stronger pain medication.

(381) Plaintiff was also informed that Plaintiff needed physical therapy.

(382) After 2 months of petitioning for some form of medical treatment, Plaintiff began to receive physical therapy on his back, but not his neck, which lasted for roughly 2 months.

(383) Defendant Rashti and Dr. Robert Cobble's _informed Plaintiff that his physical therapy would be discontinued due to budget constraints and staff reductions, ordered by the medical contractor._

(384) Since that time, Plaintiff has continued to petition for some form of medical

129

129

treatment via the sick-call procedures established for this facility.

(385) Each time Plaintiff have been meet with no success and his condition is worsening.

(386) Plaintiff's injuries have the potential to be permanent and will affect every day activities so long as Plaintiff live. Therefore, his condition should be treated as sever and Plaintiff should be receiving adequate medical treatment.

**Legal Authority and Argument**

(387) Plaintiff avers that for his 8th Amend U.S.C. Const. Rights against cruel and Unusual punishment claims, he has shown that: (i) he suffered from a serious medical need; and (ii) acts or omissions by Prison staff indicate deliberate indifference to those needs. See Estelle v. Gamble , 429 U.S. 97, 103-105 (1976).

(388) To demonstrate deliberate indifference , the plaintiff must demonstrate that defendant's were "subjectively aware of the risk" of harm to plaintiff. In doing so, plaintiff must allege acts or omissions that are sufficiently harmful to offend "evolving standards of decency." Gamble, 429 U.S. 106.

(389) Defendant's in question, "deprive[d] Plaintiff of a civil right ....when they did

the affirmative acts of failing to bring Plaintiff to Medical authorities or provide for him any access to medical care. See also **Johnson v. Duffy, 588 F.2d 740, 743, (1973)** ( ":.the requisite casual connection can be satisfied not only be some kind of direct , personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause other to inflict the constitutional injury". ) see also **Santos v. Santa Clara County Main Jail Med. Facility; 2013 U.S. Dist. Lexis 173493.**

(390) To win an Eight Amendment case, a Plaintiff must establish both an "objective component," the seriousness of the challenged conditions, and a "subjective component," the state of mind of the officials who are responsible for them. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994); Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321 (1991).

**The Objective Component:**

(391) Conditions violate the Eight Amendment if they amount to "the unnecessary and wanton infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392 (1981); Wilson v. Seiter, supra.

In cases involving risks to health or safety, courts must "assess whether society considers the risk that the prisoner complains of to be so grave

131

that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, supra.

With respect to living conditions, prisoners must demonstrate "unquestioned and serious deprivations of basic human needs" or of the "minimal civilized measure of life's necessities" to establish an Eight Amendment violation. Rhodes v. Chapman, supra.; Wilson v. Seiter, supra. The Supreme Court has listed as basic human needs "food, clothing, shelter, medical care and reasonable safety" as well as "warmth [and] exercise." Helling v. McKinney, supra. (citing DeShaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 199-200, 109 S. Ct. 998 (1989)); Wilson v. Seiter, supra.

(392) As already established in the Facts section of this Complaint, the water leak was reported by Plaintiff Carter on several occasions, day after day, to the appropriate authorities, who are the named defendants in the instant suit.

(393) It was not remedied, however, until after the Plaintiff Carter had already suffered physical injury.

(394) It is a well-established fact that our society considers the presence of a leak and standing water and the subsequent risk of a slip-and-fall accident to be one which is not acceptable in our time. A simple survey of risk management procedures involving situations such as this will show that any individual aware of such a risk, i.e. a leak and standing water, is tasked with the responsibility of eliminating said risk thus eliminating the potential for harm.

(395) In every building in America, there is a custodian/janitor who is employed to maintain the cleanliness of that building. His responsibilities include, but

132

are not limited to, fixing leaks and cleaning up any standing water.

(396) Many employers are so concerned with the risk of slip-and-fall accidents that they utilized signs which state that an area is wet/slippery and that all persons should exercise caution.

(397) In essence, no American could conceivably think it proper, let alone justifiable, to allow any individual to be subjected to the risk of harm when it is in the hands of those in power to remedy said situation.

(398) This right to reasonable safety, i.e. a right not to be subjected to the presence of standing water due to a leak and the subsequent risk of a slip-and-fall accident, is, as already established, a basic human need.

(399) The injuries the Plaintiff[3] suffered are sever and have the potential to be permanent, affecting every aspect of daily activities for the rest of his life, and they were easily preventable had the defendants acted reasonably to the clearly and present danger posed by the water leak it's self.

(400) The Plaintiff could be unable to perform basic home and work

---

[3]     Some recent Supreme Court decisions concerning prisoner's Eight Amendment claims have emphasized physical harm, or the risk of it. Farmer v. Brennan, supra. The Court has held that unsafe conditions that "pose an unreasonable risk of serious damage to [a prisoner's] future health" may violate the Eight Amendment even if the damage has not yet occurred and may not affect every prisoner exposed to the conditions. Helling v. McKinney, supra., ("a remedy for unsafe conditions need not await a tragic event").

Case 1:15-cv-00090   Document 6   Filed 10/13/15   Page 135 of 162 PageID #: 319

responsibilities which will obviously hinder his ability to advance in life, both at home and at work.

(401) The Plaintiff has and continues to suffer the loss of mobility and monetary gain as a result, thus affecting his overall standard of living.

(402) The Plaintiff could very well be subjected to intense and constant pain for the rest of his life.

(403) Therefore, the denial of adequate medical care in this instance is a sever denial of his most fundamental right to have his basic human needs met and it is one which our society also does not tolerate in our time.

(404) As an inmate, the Plaintiff is at the whims of those in power and is therefore unable to acquire any help outside of the staff members who operate the SCCF.

(405) Since prisoner's cannot obtain their own medical services, the Constitution requires prison authorities to provide them with "reasonably adequate" medical care. Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1978); see also Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979).

(406) Courts have defined "adequate" medical services as "services at a level reasonably commensurate with modern medical science and of a quality

134

acceptable within prudent professional standards," and as "a level of health services reasonably designed to meet routine and emergency medical, dental and psychological or psychiatric care." Fernandez v. U.S., 941 F.2d 1488, 1493 (11th Cir. 1991); U.S. v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987); Tillery v. Owens, 719 F. Supp. 1256, 1305 (W.D. Pa. 1989).

**Defendant Bill Morgan**

(407) Defendant Bill Morgan failed to adequately address the maintenance problem when it was presented to him.

(408) He should have fixed the leak and should have exercised more diligence in, especially since his lack of a reasonable response resulted in water collecting in the Plaintiff's cell.

(409) His lack of urgency subjected the Plaintiff to not only the risk of harm but the actual harm itself, as the Plaintiff did indeed suffer a slip-and-fall accident which injured his lower back, spine, and neck for the foreseeable future, possibility permanently.

(410) He had been made aware that the leak was present and that the standing water was present, therefore he possessed knowledge of the situation and a culpable state of mind to remedy the potential for harm.

**Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram**

(411)  Defendants Chapman, Killingsworth, Dodd, McClain, and Buttram failed to act reasonably by ensuring that Plaintiff Carter was not subject to living conditions that posed a reasonable threat of serious bodily injury.

(412)  They were collectively and individually aware of the fact that water pipes in Plaintiff's cell began to leak in late September of 2014.

(413)  Plaintiff also reported Chapman, Killingsworth, Dodd, McClain, and Buttram each which in turn, specifically denied his request to move him out of the cell until such time that that leak could be fixed-despite all having the authority to order or arrange such.

(414)  They had all been made aware that the leak was present and that the standing water was present, therefore they possessed knowledge of the situation and a culpable state of mind to remedy the potential for harm.

(415)  Their lack of a reasonable response either collectively or individually, resulted in water collecting in a cell that Plaintiff was forced to live in and could not move out of.

(416)  Their lack of a reasonable response either collectively or individually, subjected the Plaintiff to not only the risk of harm but the actual harm itself,

138

as the Plaintiff did indeed suffer a slip-and-fall accident which injured his lower back, spine, and neck for the foreseeable future, possibility permanently.

## Defendant Mrs. Rashti

(417) Defendant Mrs. Rashti was and continues to be aware that the Plaintiff suffered sever injuries to his lower back, spine, and neck as a result of both his injuries from his multiple attacks, made that much more worse by his slip-and-fall accident

(418) She failed to adequately address the medical concerns of the Plaintiff on every occasion that the Plaintiff filed sick-call slips.

(419) She has shown on many occasions, specifically nearly every time the Plaintiff has filed sick-call slips, that she is aware of his situation but has no regard for its severity.

(420) She continues to thwart the Plaintiff's attempts to receive medical attention for his injuries by incorrectly recording the reason for the Plaintiff's visits to the clinic.

(421) As a result, the Plaintiff had been subjected over a dozen months without adequate medical care.

(422) She had been made aware of the Plaintiff's injuries, therefore she possessed knowledge of the situation and a culpable state of mind to remedy the pain and suffering of the Plaintiff.

### Defendant's Dr. Robert Cobble & His Private Sector Employer John Doe Medical Health Services,(real name unknown at current time)

(423) John Doe Medical Health Services,(real name unknown at current time) was and still is the contractual health care provider and employer of Dr. Robert Cobble.

(424) John Doe Medical Health Services, for no reason other then budgetary concerns and seeking higher profits, knowingly, intentionally, and willfully ordered Defendant Dr. Cobble, to discontinue, cease, stop and absolutely interdict any and all of the critical and necessary therapeutic treatments and medication that Plaintiff Carter was being provided with.

(425) Defendant John Doe Medical Health Services, did this knowingly and intentionally, and fully aware of the fact that their decision to order Dr. Cobble to stop Plaintiff Carter's medical car and necessary therapeutic treatments, would cause the wanton infliction of unnecessary pain and suffering.

(426) Defendant Dr. Robert Cobble was and continues to be aware that the

138                                         138

Plaintiff suffered sever injuries to his lower back, spine, and neck as a result of his multiple assaults and his slip-and-fall accident.

(427) He has attempted a few times to address the underlying medical concern but following those few attempts, he has ceased all contact with the Plaintiff.

(428) The physical therapy he ordered only lasted for two months and did not adequately address all areas of injury.

(429) Following the cessation of that therapy, the Plaintiff has been unable to acquire any further medical treatment.

(430) Dr. Robert Cobble, as the physician at the SCCF, is responsible for ensuring that the Plaintiff's medical concerns are treated.

(431) As he is the one who ordered the few methods of treatment employed on the Plaintiff, he knows that the Plaintiff is still in pain and suffering.

(432) He had been made aware of the Plaintiff's injuries, therefore he possessed knowledge of the situation and a culpable state of mind to remedy the pain and suffering of the Plaintiff.

(433) Furthermore, Defendant Cobble, was well aware of the fact that budgetary constraints should not have resulted in his the cessation of critically necessary physical therapy and treatment, and yet he acquiesced to such acts,

139

and did nothing reasonable to ensure that Plaintiff's medical treatment was continued or that his pain and suffering was alleviated.

(434) Indeed Defendant Cobble's acts ensured that Plaintiff was exposed to continued wanton pain and suffering.

(435) In Eighth Amendment conditions cases, the Plaintiff must prove that the defendants acted with "deliberate indifference." Wilson v. Seiter, supra.; accord, Farmer v. Brennan, supra. Deliberate indifference in Eighth Amendment cases falls somewhere between mere negligence (carelessness) and actual malice (intent to cause harm). That is, it amounts to actual malice, for they willingly chose to go along with the decision not to continue Plaintiff's necessary medical treatment.. Farmer v. Brennan, supra.

(436) Accordingly, all of the Defendant(s) exercised deliberate indifference to the basic human needs of the Plaintiff Carter and subjected him to Cruel and Unusual Punishment.

140

## Claim (m)

m.) **Due to the malicious and harmful intent of Defendants to make Plaintiff suffer the wanton and gratuitous infliction of pain and suffering,** _plaintiff was forced to walk with hands behind his back, up and down wet flights of stairs, which resulted in serious and grave injuries,_ **in direct violation of his 8th Amend U.S.Const. Rights against cruel and Unusual punishment.**

(437) The actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker, Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin Chapman, Killingsworth, Dodd, McClain, and Buttram in forcing Plaintiff to walk with his hands behind his back, both up and down flights of stairs and in the rain, subjected him to a risk of serious injury.

(438) Also the actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker, Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin Chapman, Killingsworth, Dodd, McClain, and Buttram in forcing Plaintiff to walk with his hands behind his back, both up and down flights of stairs and in the rain, caused plaintiff to suffer a serious injury.

(439) Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony

141

Parker ordered Defendant's Corrections Corporation of America, Damon Hininger, Tony Garfingle, and Jason Medlin to implement a policy whereby Plaintiff and other inmates housed at S.C.C.F. would be forced to walk with military precision, in line and with heir hands behind their back.

(440) Defendant's Corrections Corporation of America, Damon Hininger, Tony Garfingle, and Jason Medlin, in turn gave express and explicit directions to Defendants Chapman, Lindamood, Dodd, Hacker, Deavers, McClain, and Buttram, to implement a policy whereby Plaintiff Carter and other inmates housed at S.C.C.F. would be forced to walk with military precision, in line and with heir hands behind their back.(see At**tached Exhibit #14_Memo Regarding Walking with hands behind back)**

(441) Plaintiff avers that after this policy was implemented he was forced to walk with his hands behind his back on wet slippery steps and concrete, and could not use his swinging arms as an adequate counter balance to ensure that he maintained his balance while ambulating (ie walking) around the compound.

(442) As a result of being forced to walk with his hands behind his back, he was unable to maintain his balance properly and has has fallen several times and seriously injured himself as a result of this fall.

142

142

(443) Plaintiff avers that as a result of these falls he has suffered from swollen and bruised knees, shins and forearms and wrists; as well as contusions on his head where he has bumped it.

(444) The above defendants possessed knowledge of the situation, and were all aware that the Plaintiff, as an older gentlemen with deteriorating health, being forced to walk with his hands behind his back constituted a grave risk or serious injury.

(445) Yet Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin Chapman, Killingsworth, Dodd, McClain, and Buttram, disregarded this risk and forced plaintiff to walk with his hands behind his back.

(446) Plaintiff was and continues to be in constant pain due to the injuries he has suffered as a direct result of this collective policy implementation by Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin Chapman, Killingsworth, Dodd, McClain, and Buttram,

(447) These defendants were able to remedy it and prevent Plaintiff's risk of serious injury, (i.e. by not implementing such a dangerous policy) and yet they did not do so, and this in turn amounts to a violation of the plaintiff's constitutionally protected right against Cruel and Unusual Punishment under the U.S. Constitution, Amendment VIII.

## State Tort Claims:

### *Assaults, injury to the person, and intentional infliction of emotional harm, intentional infliction of pain and suffering, and Negligence*

(448) Plaintiff avers that Campbell v. Corrections Corp. of America, 2001 Tenn. App. Lexis 601,,Aug. 7th, 2001, is particularly relevant in the context of his state tort claims.

(449) Indeed this case holds that:

> "..negligence could only have been accomplished by employees of [C.C.A], though a lack of training and/or supervision on the part of [C.C.A]. Therefore, [Plaintiff] alleged actions on behalf of [C.C.A] that sustain the legal theory of negligence. Since any number of appellee's employees could have performed the negligence, appellant also put forth the legal theory of resondeat superior. [C.C.A] is responsible for the negligence of any of it's employee's part [toward the inmates] under [C.C.A's] supervision resulting from the acts of any of [C.C.A's] employees. See Mid-Continent Pipeline Company v Crathers Oklahoma, 1954 OK 61, 267 P. 2d. 568.

(450) It is well established in Tennessee that an employer is vicariously liable for the actions of it's employees under the doctrine of *respondeat superior* as long as the employee is acting with the scope of his duties..." Tennessee Famrers Mut. Inc. Co. v American Mut Liab. Ins. Co. 840 S.W. 2D, 933, 937 (Tenn. Cr. App. 1992) Bowers v Potts, 617 S.W. 2d. 149, 156 (Tenn.Ct. App. 1981)

(451) Moreover, "the right of a person who has been injured or whose property has been damaged by negligence of an employee to sue the employer without

145

joining the employee" as a defendant has been well established in Tennessee in Williams v. Pricharard, (1957). 43 Tenn. App. 140, wherein the the court quoted with approval from Vol. 2 Am. Jur.

(452) Indeed Tennessee Courts have held:

> On the question of joinder of principal and agent as parties defendant in actions predicated upon the tort of the agent, there is some lack of harmony. According to the general rule, if the tort for which the plaintiff sues was committed by an agent so that there is a liability upon both the agent, for the commission of the tort, and upon the principal for the act of the agent with in the scope of his employment, both principal and agent may be joined as parties defendant...

(453) In Rankorn v Sealtest Fods, 749 S.W. 2d, 649, 652 (Tenn.Ct. App. 1971), the court of Appeals held that the employer was not released form liability even though the plaintiff had taken a voluntary non-suit as to the employee defendant and the the employer was still liable under a *resondeant superior* theory for the employees actions even if the plaintiff chose not to proceed against the employee and only against the employer.

(454) The test for holding an employer liable requires the plaintiff to prove: (i) that the person who caused the injury was an employee, (ii) that the employee was on the employer's business, and (iii) that the employee was acting with the scope of his employment when the injury occurred. (Tennessee Farmer Mut Ins.,at 937.

146

148

(455) Thus, this Honorable District court exercising pendant/Supplemental jurisdiction, is obligated to take Plaintiff Carter's allegations as true, and find that there's tortious negligence attributable to Correction Corporation of America, by the actions committed by it's employees in by failing to protect him and provide him adequate medical care and treatment, as well as stop their denials of such when it was brought to their attention.

(456) Indeed numerous Tennessee State court's have held that C.C.A is the proper defendant for negligence clams or torts arising from C.C.A's operation of correctional facilities or the acts of its employees. **Martin v. State of Tennessee 2001 .App. Lexis 471, (July 5th 2001), Greer v. Corrections Corp of America, 1996 Tenn.App.Lexis. 775, (Tenn.App.C Dec. 6, 1996).**

(457) Furthermore, absolute sovereign immunity doesn't apply to either of the defendants C.C.A or it's employees because the Private Prison employees are not "state employees".

(458) Indeed of particular relevance are the   provisions the *Tennessee Private Prison contracting Act*: which expressly states that: " ...the sovereign immunity of the state <u>shall not apply to the contractor</u>. Neither the contractor nor the insurer of the contractor may plead the defense of sovereign immunity in any action arising out of the performance of the

contract..." (**T.C.A. § 41-24-107(b).**)

(459) The State of Tennessee has squarely addressed this issue in **Martin v State, 2001 Tenn.App.Lexis, 471 (July 5th, 2001)**, wherein the court held that The Private Prison contracting act, makes clear that:

> " the purpose of the act was to allow the State of Tennessee to use C.C.A. as an independent contractor to operate a limited number of correctional facilities. The state was to pay a contract price for the services included in the contract. That plan must be 'adequate to protect the sate from any and all actions by a third party against the contractor of the state as a result of the contract.....The dismissal of the Claimant's claim, [in the Tennessee State Claims commission] was proper because C.C.A employees whose acts he complains _of were not state employees_.."

(460) As a result Plaintiff Carter avers that the aforementioned factual allegations form an adequate and legally sufficient basis to sustain the following state tort claims:

(i.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker, Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in implementing policy of: (1) improper and inadequate staff training, constitutes the tort of negligence under the law of the State of Tennessee.

(ii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason

148                                      149

Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Hacker, Christopher McClain, in implementing policy of: (2) out of control staffing which did not properly report assaults, and illegal activities up through the chain of command; constitutes the tort of negligence under the law of the State of Tennessee.

(iii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in implementing policy of: (3) intentionally and knowingly failing to supervise staff and administer measures which would: (i) not allow gangs to engaged in blatant, unadulterated and flagrant STG activities, in full view of the camera, 365 days a year 24 hours a day; and (ii) not permit the violent assaultive, known STG affiliated inmates to engage in such illegal and blatant behavior- constitutes the tort of negligence under the law of the State of Tennessee.

(iv.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in purposefully and willfully choosing not to employ any of the *effective standard procedures that they had in place*, to prevent -and then when necessary to investigate-incidents of

alleged STG activity, and assaults, constitutes the tort of negligence under the law of the State of Tennessee.

(v.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in failing to provide inmate movement controls necessary to prevent the rampant egress and ingress of aggressive assailants and STG affiliated inmates, within the open dormitories, and general population, wherein plaintiff Carter was forced to reside, constitutes the tort of negligence under the law of the State of Tennessee.

(vi.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in purposefully and knowingly transfering known inmate assailants who were violent known STG affiliated inmates out of maximum security housing units and into General population, wherein plaintiff Carter was forced to reside, constitutes the tort of negligence under the law of the State of Tennessee.

(vii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections

Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin Chapman, Killingsworth, Dodd, McClain, in willfully choosing not to designate an institution, pod or other suitable housing unity specifically designed for and designated as an STG affiliation camp, to ensure that non-affiliated and affiliated inmates do not mingle on the compound constitutes the tort of negligence under the law of the State of Tennessee.

(viii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly *refusing to enforce the policy of STG activity suppression in Housing units Colombia, Gemini and Apollo* , while strictly enforcing them in Housing units Discovery and enterprise, and the Annex, and while plaintiff was assigned to *Columbia*, resulted directly in his injuries and suffering, and therefore constitutes the tort of negligence under the law of the State of Tennessee.

(ix.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly refusing to enforce the policy of STG activity in Housing units Colombia,

151

Gemini and Apollo, while strictly enforcing them in Housing units Discovery and enterprise, and the Annex, while plaintiff was as singed to Columbia, resulted directly in his injuries and suffering, and therefore constitutes the tort of intentional infliction of mental and emotional suffering under the law of the State of Tennessee.

(x.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly enforcing a policy that required Plaintiff to walk in the rain, on slippery concrete with his hands behind his back, resulted directly in his injuries and suffering, and therefore constitutes the tort of intentional infliction of mental and emotional suffering under the law of the State of Tennessee.

(xi.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly enforcing a policy that required Plaintiff to walk in the rain, on slippery concrete with his hands behind his back, resulted directly in his injuries and suffering, and therefore constitutes the tort of assault and battery under the law of the State of Tennessee.

(xii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly enforcing a policy that required Plaintiff to walk in the rain, on slippery concrete with his hands behind his back, resulted directly in his injuries and suffering, and therefore constitutes the tort of negligence under the law of the State of Tennessee.

(xiii.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker in intentionally and knowingly enforcing a policy that required Plaintiff and other inmates to suffer "hardship, pain and misery" while incarcerated constitutes the tort of assault and battery under the law of the State of Tennessee.

(xiv.) The individual and collective actions of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker in intentionally and knowingly enforcing a policy that required Plaintiff and other inmates to suffer "hardship, pain and misery" while incarcerated constitutes the tort of intentional infliction of mental and emotional suffering under the law of the State of Tennessee.

(xv.) The individual and collective actions of Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd,

155

Christopher McClain, in intentionally and knowingly enforcing a policy of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker that required Plaintiff to suffer "hardship, pain and misery" while incarcerated constitutes the tort of assault and battery under the law of the State of Tennessee.

(xvi.) The individual and collective actions of Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly enforcing a policy of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker that required Plaintiff to suffer "hardship, pain and misery" while incarcerated constitutes the tort of official oppression under the law of the State of Tennessee.

(xvii.) The individual and collective actions of Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in intentionally and knowingly enforcing a policy of Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker that required Plaintiff to walk in a line with his hands outside of his pockets with no gloves, in freezing temperatures; (ii) wait in line consistently outside in the rain for no reason, other then to make the inmates angry and to feel miserable; (iii) forcing Plaintiff to be awakened multiple times throughout the evening, purposefully subjecting him to willful sleep deprivation; all

154

154

constitutes the tort of official oppression, and intentional infliction of mental and emotional suffering under the law of the State of Tennessee.

(xviii.)   The individual and collective actions of Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in knowingly refusing to remove Plaintiff from cells wherein dangerous living conditions existed; to wit: slippery wet floors and black mold, constitutes the tort of official oppression and intentional assault and battery, under the law of the State of Tennessee.

(xix.) The individual and collective actions of Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, in forcing Plaintiff Carter to live in cells wherein dangerous living conditions existed; to wit: slippery wet floors and black mold, constitutes the tort of negligence and intentional infliction of pain and suffering, under the law of the State of Tennessee.

(xx.) The individual and collective actions of Mrs. Rashti, Dr.Robert Cobble, and the defendant John Doe Medical provider, in failing to render proper aid and medical treatment constitutes to torts of medical malpractice, negligence and intentional infliction of pain and suffering.

## Relief Requested:

(461) **WHEREFORE THE FOREGOING REASONS,** the plaintiff requests that the Court grants the following relief:

### *Injunctive Relief against Defendants in their Official Capacity:*

(462) A.   Issue an immediate injunction requiring the immediate transfer of Plaintiff Carter to Deberry Special Needs Facility, wherein he can receive both the medical treatment he desperately needs and be free from the pervasive risk of violent STG inmate activity and attacks that he has suffered as a direct result of the Defendants collective and individual actions.

(463) B.   Issue an injunction ordering Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, and their agents to in their official capacity:

> 1.   Immediately arrange for the cessation of all activities which are in direct contravention to the constitutionally protected right of the Plaintiff under the **U.S. Constitution, Amendment VIII**.

> 2.   Immediately arrange for the rigid and consistent enforcement of procedures and policies which will ensure that the Plaintiff and all other likewise situated inmates are protected against Cruel and Unusual Punishment by offering zero tolerance for STG activity, proper segregation of inmates who engage in STG activity, and zero inter mixing policy of confirmed, suspected STG affiliated inmates

156

and those inmates who are not; more adequate maintenance services, sick-call services, and medical treatment.

    3.    Refrain from destroying any recorded video evidence of the pervasive STG activity in the Housing units.

(464) C.    Issue an injunction ordering Defendant's TDOC Commissioner Schofield, Jason Woodall, and Tony Parker Corrections Corporation of America, Damon Hininger, Tony Garfingle, Jason Medlin, Arvil Chapman, Cheryl Lindamood, Killingsworth, Danny Dodd, Christopher McClain, and their agents to:

    1.    Refrain from taking retaliatory actions against the plaintiff and all parties acting in concert with him.

    2.    Refrain from making him walk with his hands behind his back.

### *Compensatory Damages:*

(465) Plaintiff also prays that this Honorable Court:

    D.    Award compensatory damages to the Plaintiff against Defendant Derrick Schofield, in the amount of $100,000.00 individually.

    E.    Award compensatory damages to the Plaintiff against Defendant Tony Parker, in the amount of $100,000.00 individually.

    F.    Award compensatory damages to the Plaintiff against Defendant Jason Woodal in the amount of $100,000.00 individually.

    G.    Award compensatory damages to the Plaintiff against Defendant Joel Foster, in the amount of $100,000.00 individually.

    H.    Award compensatory damages to the Plaintiff against Defendant Bryant Williams, in the amount of $100,000.00 individually.

    I.    Award compensatory damages to the Plaintiff against Defendant Corrections Corporation of America, in the amount of $100,000.00 individually.

    J.    Award compensatory damages to the Plaintiff against Defendant Damon Hininger, in the amount of $100,000.00 individually.

K.   Award compensatory damages to the Plaintiff against Defendant Tony Garfinkle, in the amount of $100,000.00 individually.

L.   Award compensatory damages to the Plaintiff against Defendant Jason Medlin, in the amount of $100,000.00 individually.

M.   Award compensatory damages to the Plaintiff against Defendant Cheryl Lindamood,  in the amount of $100,000.00 individually.

N.   Award compensatory damages to the Plaintiff against Defendant Arvil Chapman, in the amount of $100,000.00 individually.

O.   Award compensatory damages to the Plaintiff against Defendant Danny Dodd, in the amount of $100,000.00 individually.

P.   Award compensatory damages to the Plaintiff against the Estate of Dan Deavers, in the amount of $100,000.00 individually.

Q.   Award compensatory damages to the Plaintiff against Defendant Mark Hacker, in the amount of $100,000.00 individually.

R.   Award compensatory damages to the Plaintiff against Defendant Katherine Buttram, in the amount of $100,000.00 individually.

S.   Award compensatory damages to the Plaintiff against Defendant Bill Morgan, in the amount of $100,000.00 individually.

T.   Award compensatory damages to the Plaintiff against Defendant Rashti, in the amount of $100,000.00 individually.

U.   Award compensatory damages to the Plaintiff against Defendant Dr. Robert Cobble, in the amount of $100,000.00 individually.

V.   Award compensatory damages to the Plaintiff against Defendant John doe Medical Contractor,   in the amount of $100,000.00 individually.

### Punitive Damages:

(466) Plaintiff also prays that this Honorable Court:

D.   Award punitive damages to the Plaintiff against Defendant Derrick Schofield, in the amount of $250,000.00 individually.

E.   Award punitive damages to the Plaintiff against Defendant Tony Parker, in the amount of $250,000.00 individually.

F.   Award punitive damages to the Plaintiff against Defendant Jason Woodal  in the amount of $250,000.00 individually.

G.   Award punitive damages to the Plaintiff against Defendant Joel

158

Foster, in the amount of $250,000.00 individually.

H.     Award punitive damages to the Plaintiff against Defendant Bryant Williams, in the amount of $250,000.00 individually.

I.     Award punitive damages to the Plaintiff against Defendant Corrections Corporation of America, in the amount of $250,000.00 individually.

J.     Award punitive damages to the Plaintiff against Defendant Damon Hininger, in the amount of $250,000.00 individually.

K.     Award punitive damages to the Plaintiff against Defendant Tony Garfinkle, in the amount of $250,000.00 individually.

L.     Award punitive damages to the Plaintiff against Defendant Jason Medlin, in the amount of $250,000.00 individually.

M.     Award punitive damages to the Plaintiff against Defendant Cheryl Lindamood, in the amount of $250,000.00 individually.

N.     Award punitive damages to the Plaintiff against Defendant Arvil Chapman, in the amount of $250,000.00 individually.

O.     Award punitive damages to the Plaintiff against Defendant Danny Dodd, in the amount of $250,000.00 individually.

P.     Award punitive damages to the Plaintiff against the Estate of Dan Deavers, in the amount of $250,000.00 individually.

Q.     Award punitive damages to the Plaintiff against Defendant Mark Hacker, in the amount of $250,000.00 individually.

R.     Award punitive damages to the Plaintiff against Defendant Katherine Buttram, in the amount of $250,000.00 individually.

S.     Award punitive damages to the Plaintiff against Defendant Bill Morgan, in the amount of $250,000.00 individually.

T.     Award punitive damages to the Plaintiff against Defendant Rashti, in the amount of $250,000.00 individually.

U.     Award punitive damages to the Plaintiff against Defendant Dr. Robert Cobble, in the amount of $250,000.00 individually.

V.     Award punitive damages to the Plaintiff against Defendant John doe Medical Contractor, in the amount of $250,000.00 individually

(467) Grant such other relief as it may appear the Plaintiff is entitled to.

## SELF VERIFICATION AND DECLARATION
## PURSUANT TO 28 U.S.C. § 1746

Pursuant to **28 U.S.C. § 1746**, I declare under penalty of perjury that the foregoing is true and correct to the best of my belief, information, and knowledge.

*Austin Carter*

Austin Carter # 400700
Co-counsel of Record
S.C.C.F.; P.O.Box # 279
Clifton Tenn, 38425


## CERTIFICATE OF SERVICE

I, Austin Carter, TDOC # 400700, do hereby swear and affirm that a copy of the foregoing document(s) have been forwarded to the following individual(s) via Pre-Paid First-Class United States Postage, and I further certify that I have placed these legal document(s) in the prison's mailing system on this the 5th day of October, 2015.

Keith Throckmorton
Clerk of the Court
USDC, Middle District
801 Broadway Rm. 800
US Cthse.
Nashville, TN 37203

*Austin Carter*

Austin Carter # 400700
S.C.C.F.; P.O.Box # 279
Clifton Tenn, 38425

160